Martin P. Butler, Plaintiff-Appellee, v. James W. Palm, Defendant-Appellant.

Gen. No. 11,537.

Second District, First Division.
August 2, 1962.
Rehearing denied September 6, 1962.

McConnell, Kennedy, McConnell & Morris of Peoria, for appellant.

Cassidy & Cassidy, of Peoria, for appellee.

DOVE, P. J.

Martin P. Butler, plaintiff, shortly before nine o'clock on the morning of October 1, 1956 was operating his automobile in an easterly direction on Franklin Street in the City of Peoria. In obedience to the traffic light he stopped his car at the intersection of that street and Adams Street. He intended to make a left hand turn and then proceed north on Adams Street. While stopped, waiting for the traffic signal to change, the rear of his car was struck by an automobile being driven by the defendant, James W. Palm, who was proceeding eastward on Franklin Street.

On April 16, 1958 the instant complaint was filed to recover for the injuries alleged by plaintiff to have been suffered by him as a result of this rear-end collision. The complaint contained no general charge of negligence but did charge that defendant, (1) was driving without keeping a safe and proper lookout ahead; (2) was following more closely than was reasonable and proper contrary to the provisions of section 158(a) Chapter 95½ Illinois Revised Statutes; and (c) was driving at a speed which was greater than reasonable and proper, having regard for the traffic and the use of the way. The answer of the defendant admitted that

at the time and place alleged, he was driving his motor vehicle in an easterly direction along Franklin Street but denied all other allegations of the complaint. The issues made by the pleadings were submitted to a jury resulting in a verdict in favor of the plaintiff for $17,500 upon which judgment was rendered and defendant appeals.

The record discloses that on the morning of the occurrence the weather was clear and the pavement dry. There were two eastbound and two westbound lanes of traffic on Franklin Street. Defendant accompanied by his wife, was driving his 1950 Oldsmobile proceeding east on Franklin Street in the north traffic lane and close to the center line. As defendant approached the Franklin and First Street intersection which was 75 or 80 feet west of the Franklin-Adams Street intersection, defendant saw plaintiff's car and observed that it had stopped in the north traffic lane at the Franklin-Adams Street intersection, in obedience to the traffic signal. Defendant testified that he saw plaintiff's car when he was more than a block away; that he was travelling about ten miles per hour as he approached this intersection and that he never increased his speed; that when he arrived at a point thirty or forty feet west of the rear end of plaintiff's car and in the same traffic lane, he attempted to apply his brakes and when he did so the brake pedal went to the floor and remained there. He further testified that the brakes were ineffective and that the front end of his car collided with the rear of plaintiff's car which caused plaintiff's car to move forward across the crosswalk about eight or ten feet. As a result of the impact the center of the rear bumper and the back of the trunk of plaintiff's car were pushed in and the left front fender and bumper of defendant's car were bent and the left head light broken. Defendant further testified that his brakes worked satisfactory up until the time he applied them

on Franklin Street at a point thirty or forty feet west of the rear end of plaintiff's car. He further testified that, after he left the scene of the accident and drove a couple of miles to Egolf Motors, his brakes were efficient.

At the time of the accident plaintiff was 37 years of age and was employed by the Montgomery Elevator Company as a service man. He had been so employed since 1946 and did maintenance work and trouble shooting in public elevators. In the course of his employment he worked on elevator controls and his duties required him to be on top of elevator cars, in the pits, and up and down the hatch. Following the collision the plaintiff and defendant remained at the scene of the accident only a few minutes and, after a short conversation, defendant proceeded in his car to Egolf Motors.

Plaintiff testified that on the morning of the occurrence he had left his office at the Montgomery Elevator Company on Seventh Street and was on his way to make some repairs to the elevator at a Sears Roebuck Store; that he was alone in his car and had stopped at the Franklin-Adams intersection in obedience to the traffic signal; that as a result of the impact his car moved forward about fifteen feet; that he got out of his car and had a conversation with Mr. Palm in which "Mr. Palm said, 'We don't have to call the police on this, do we?' and I said 'No.' "

The plaintiff further testified that after he left the scene of the accident he went back to his office and worked that day and continued his work at the Elevator Company until December 30, 1956.

The record further discloses that on Friday, October 5, 1956, plaintiff went to the office of Dr. Paul Roark, his family physician, who examined him and found him to be suffering from a strain or sprain of the muscles and ligaments of his neck, commonly referred to as a whiplash injury. There was limitation of motion in his

neck and he suffered pain and the doctor prescribed heat, rest and massage. On October 23, 1956 Dr. Roark again examined plaintiff at his office and the x-rays which had been taken were read and disclosed no fracture. The Doctor again prescribed a treatment of heat, rest and massage. Doctor Roark testified that plaintiff made no complaint of any incoordination in his muscles or any loss of visual acuity and Dr. Roark did not observe any lack of coordination or any symptoms of brain damage or spinal cord injury on plaintiff's visits to his office either on October 5th or October 23, 1956 nor did the Doctor ever make such a diagnosis.

On Saturday, December 29, 1956 plaintiff drove his car and family to a bowling alley, arriving there about one o'clock in the afternoon. After plaintiff had been there for about an hour and a half he testified that he began to feel sick and tired, "that he couldn't see just right and that everything was blurry like." He had never had any such symptoms before.

Accompanied by his family he left the bowling alley and drove his car to his home. Upon his arrival there he vomited, had a general feeling of tiredness, thought he was catching a cold and went to bed. The following day he was taken to St. Francis Hospital in Peoria and Dr. Roark was called. Dr. Roark found him in an unconscious condition and his disability was subsequently diagnosed as a pneumonia and meningoencephalitis. The evidence is that meninges are layers of membrane which cover the brain and the spinal cord; that between these meninges and the surface of the brain is the spinal fluid and meningoencephalitis is an infection of these membranes and is present not only in the spinal fluid but in the substance of the brain itself.

The plaintiff remained in a state of unconsciousness until the middle of February, 1957, and while in this condition he developed pneumonia. On January 8, 1957 Dr. Bruce Ehmke, a specialist in medical neurology,

356

was called, by Dr. Roark, for consultation and he made a clinical and neurological examination of the plaintiff and continued to treat him in a consulting capacity while the plaintiff remained at the hospital. On January 19, 1957, Dr. Morris Cohen, a bronchoscopist, performed a tracheotomy as an air passage to one of plaintiff's lungs was plugged with mucus.

On April 19, 1957 plaintiff was discharged from the hospital and returned to his home. He remained at his home for four or five months before returning to his work with the Montgomery Elevator Company. In October 1957 he resumed his duties at the Elevator Company and worked for six weeks and then returned to his home and remained there until July, 1958 at which time he again entered the employ of the Elevator Company and worked a couple of months. He then ceased to work for the Elevator Company and since leaving that company his employment has been irregular and his earnings were approximately one-third of what they had been prior to December 29, 1956. At the time of the trial plaintiff had a thickening of his speech, a balance problem, difficulty with his vision and his attitudes and entire personality have changed and his condition is probably permanent.

Appellant insists that the evidence discloses that the accident of October 1, 1956 was not causally related to the onset of meningoencephalitis on December 30, 1956; that incompetent medical evidence was admitted over defendant's objection; that the court erred in giving an instruction defining proximate cause and that there is no evidence of actionable negligence on the part of the defendant.

According to counsel for both parties the principal issue in this litigation is whether there is any causal connection between the accident which occurred on October 1, 1956 and the subsequent meningoencephalitis infection. Upon this issue the evidence is that the

357

plaintiff, at the time of the accident, had a slight cold and a sore neck. He was on his way to make repairs to an elevator at a Sears Roebuck Store. Plaintiff testified that after the impact, and when his car had come to a stop the soreness in his neck extended from the base of his skull to the top or middle part of his shoulders. The accident occurred about nine o'clock on Monday morning, October 1, 1956. The accident only delayed him a few minutes and he proceeded in his car and engaged in his usual and customary work that day and also on the following Tuesday, Wednesday, Thursday and Friday. On Friday, for the first time, he consulted his family physician, Dr. Paul Roark, at his office. His only complaint was that he had a pain in his neck. Dr. Roark examined him and found a limitation of motion and a muscle spasm in the neck. X-ray pictures were subsequently taken and plaintiff continued to perform the usual duties in connection with his employment. He did not see Dr. Roark, or learn anything about what the x-ray pictures revealed, until October 23, 1956.

On October 23, 1956, the plaintiff again went to Dr. Roark's office and his only complaint at that time, was that he had a pain in his neck. Dr. Roark's diagnosis was that of strain or sprain of the muscles and ligaments of the neck which, Dr. Roark said, was popularly called a whiplash injury. The Doctor's recommended treatment was rest, massage and the application of heat which the Doctor instructed plaintiff to do at home. The x-rays disclosed no fractures and there were no bumps or open wounds on his head and plaintiff was, according to Dr. Roark's testimony, alert, coherent, intelligent and cooperative and did not complain of any dizziness or any trouble with his vision, or loss of muscular coordination. After October 23, 1956, the plaintiff did not return to Dr. Roark for treatment or examination and did not avail himself of the services

358

of any doctor and no physician treated him until he was hospitalized on December 30, 1956.

Dr. Roark testified as a witness for the plaintiff at the trial on November 9, 1960, and stated that his clinical, pathological, and x-ray examinations of the plaintiff, prior to December 30, 1956, at no time disclosed any damage to plaintiff's brain or spinal cord or any injury to either and that he did not mean to imply that there was any actual damage caused to his brain by the accident which occurred on October 1, 1956. In response to counsel for plaintiff's query, whether he had an opinion, based upon reasonable medical certainty, as to whether or not the accident of October 1, 1956, might or could have brought about the condition of meningoencephalitis that the doctor had diagnosed on or about December 30, 1956, the witness, after stating he did have an opinion, said, in response to counsel's question to state his opinion: "I don't believe that directly there is a connection between the pneumonia or infection and the accident and meningoencephalitis." When asked to explain the reasons for his opinion the Doctor said: "There is quite a lot of material written in the literature on whiplash injuries and the results of, and if you assume that with a whiplash injury he had some damage to his cord . . . ." At this juncture counsel for defendant interrupted and objected because there was no evidence in the record of any such damage. The objection was sustained. Counsel for plaintiff then re-asked the doctor to explain his reason for his opinion. The Doctor answered: "If he had damage to his brain and the cord from the whiplash injury . . . ." Counsel for defendant interrupted and again objected stating that there was no evidence that there was any damage to plaintiff's brain or cord arising from the accident of October 1, 1956. Again the court sustained the objection, struck the answer and instructed the jury to disregard it. The doctor then, in answer to counsel's

359

question whether the trauma or accident in question might or could have caused damage or injury to plaintiff's cord, answered, without objection, that in his opinion it might or could injure the cord. Counsel for plaintiff, then asked the Doctor whether he had an opinion, based on a qualified degree of medical certainty, whether the accident of October 1, 1956, might or could have caused injury to the brain? The doctor answered in the affirmative and over the objection of counsel for defendant, gave it as his opinion that the accident of October 1, 1956 might or could have caused injury to the brain of the plaintiff.

When asked to explain his opinion that there might or could be a connection between the accident and the condition of meningoencephalitis Doctor Roark said, that if the plaintiff had damage to his brain or his cord from the injury, then it was medically probable that he could get a meningoencephalitis secondary to it. Counsel for defendant again objected and moved that the answer be stricken and the jury instructed to disregard it. The court overruled the objection and denied the motion.

This same witness, Doctor Roark, when his pre-trial deposition was taken on March 19, 1959, testified that in his opinion there was no causal connection between the accident of October 1, 1956 and the meningoencephalitis which had its onset December 30, 1956. Five days before the trial he re-affirmed this opinion to counsel for defendant, and on the trial testified that counsel for defendant had asked him on the preceding Friday whether there might or could be a causal connection between the trauma of October 1, 1956 and this subsequent condition of ill-being involving meningoencephalitis and that he, the Doctor, told counsel that he thought there was no connection. When asked, on cross-examination why he had altered his opinion, Dr. Roark replied: "I believe that the reason that I have

altered my opinion is that, if I assume that there are bugs in the body, and if I assume that there could be some damage to the brain or cord, I can put the two things together and possibly give this guy his meningoencephalitis three months later. That is the basis for my changing my opinion." The doctor was then asked: "Did I understand you to say you changed your mind about what you told me previously and what you testified to here today, on a consideration that if you assume some damage to Mr. Butler's spinal cord or brain, then your answer was, that there might be or could be a causal connection?" To this question the Doctor answered: "Yes Sir."

Dr. Fred Stuttle, a specialist in orthopedic surgery, examined the plaintiff on October 4, 1960, at the request of counsel for the plaintiff. He testified, on behalf of the plaintiff, and in response to a hypothetical question stated that in his opinion the trauma of October 1, 1956 could or might have been the cause of the meningoencephalitis. In explaining his answer the Doctor said: "This brain injury that I'm starting to talk about that I described as having occurred to this (hypothetical) man by the accident of October, 1956, creates an inflammation, creates an area of lowered resistance, which is an ample, often necessary, reason for the development of infection in an area, granted that there was a muscle or bone which affected this region, a matter of nearly three months later."

Dr. Robert B. Rutherford, who practices his profession in Peoria and who specializes as an internist and diagnostician was called as a witness for the defendant. He testified that meningitis and encephalitis are infectious diseases and that the usual period of incubation for infectious meningoencephalitis varies from one to three or four days and in answer to a hypothetical question this witness was of the opinion that the injury received by the hypothetical man on October 1, 1956

and the meningoencephalitis which had its onset on or about December 30, 1956, were not related.

Dr. Bruce Ehmke, a specialist in the diagnosis and medical treatment of the physical or organic diseases of the nerve system and who practices his profession in Peoria was also called as a witness by defendant. It was Dr. Ehmke, who examined plaintiff, at St. Francis Hospital in Peoria, on January 8, 1957, having been called by Dr. Roark. Dr. Ehmke testified that meninges are layers of membrane which cover the brain and the spinal cord; that between these meninges and the surface of the brain is the spinal fluid; that the brain itself is referred to by the term 'encephalon', and that meningoencephalitis is induced by a bacteria or a germ and is an infection of the membranes, the fluid in, and the substance of the brain itself. The Doctor testified that the incubation of bacterial meningoencephalitis depended upon the organism and that some organisms may be as long as three weeks in developing while in others the infection may develop from five to seven days. The Doctor further testified that when the spinal cord is injured there is always immediate symptoms in the form of disturbance of the control of the muscles of the arms or legs and in mild injuries to the brain there would be an onset of headache, dizziness or something of that nature within twenty-four hours.

In response to a hypothetical question this Doctor's opinion was that there was no connection between the trauma arising from the accident of October 1, 1956 and the subsequent condition of meningoencephalitis. His opinion was based upon the fact that there was no open wound caused by the accident, that plaintiff's symptoms were comparatively minimal and that he entered into active work following his injury.

█ █ The foregoing is a fair resume of the evidence found in this record. From this evidence the jury found that the trauma which plaintiff sustained in

362

the automobile accident on October 1, 1956 caused an infectious disease known as meningoencephalitis which had its onset on or about December 29th or 30th, 1956. We recognize that it is the jury's function to weigh contradictory evidence, judge the credibility of the witnesses and draw the ultimate conclusion as to the facts. Its conclusion, whether relating to negligence, causation, or any other factual matter should not be set aside merely because different conclusions could be drawn or because judges feel that other results are more reasonable, but its conclusions must be supported by something more than mere speculation. (Finley v. New York Cent. R. Co., 19 Ill2d 428, 434, 436, 167 NE2d 212.)

At the time of the instant occurrence on October 1, 1956 plaintiff had a cold and a sore neck. In June, 1956 he had an attack of lobar or walking pneumonia and was disabled for ten days or two weeks. On October 5, 1956, he, for the first time after the collision, went to the office of his family doctor. His only complaint to the Doctor was that he had pain in his neck and some limitation of motion when he sought to rotate his head and the Doctor's diagnosis was a strain or sprain of the muscles of his neck. There were no open wounds on his head or neck and Doctor Roark testified that the clinical, pathological and x-ray examinations of the plaintiff prior to December 30, 1956 indicated no damage to the brain or spinal cord and that he did not intend to imply that there was any actual damage to the brain or spinal cord occasioned by the accident on October 1, 1956. Upon his pre-trial deposition he testified there was no connection between the accident and the subsequent condition of meningoencephalitis and a week before the trial he was of the same opinion.

Upon the trial, however, Dr. Roark testified, upon direct examination, that there was a causal connection between the trauma suffered in the accident and the

meningoencephalitis. In arriving at this opinion the record shows that the Doctor assumed that as a result of the collision on October 1, 1956, plaintiff's brain or cord had been injured. Doctor Roark, however, was the examining physician and he testified that no damage or injury to the brain or spinal cord was disclosed by his examinations prior to December 30, 1956. Dr. Roark's opinion that there was a causal connection is undermined by an assumption of brain or spinal cord injury which he did not find as a result of his clinical, pathological or x-ray examination of the plaintiff on the two occasions he saw him prior to December 30, 1956. The reading of the record indicates that Dr. Roark's final opinion is a pure guess, conjecture or surmise. After assuming that there had been a brain or cord injury due to the collision on October 1, 1956, he also assumed that there were "bugs," as he expressed it, in plaintiff's body at the time of the injury and concluded that "possibly" meningoencephalitis could result three months later.

■■ Dr. Stuttle's testimony is subject to the same infirmities. He made an unwarranted assumption in answering the hypothetical question propounded to him. Furthermore he testified that incubation is the period of time from which an organism enters the body until the body has a sickness from it. The Doctor was then asked: "What is the incubation period for the disease of meningoencephalitis," and his reply was: "In the first place, if its trauma, it is instantaneous, or practically so. If it is due to organisms it would vary, so far as shortness is concerned, with the organism. As least, some organisms are faster than others as to the onset from the moment they enter the body." In answer to counsel's further question: "Isn't it true that it is equally as true that there could not be a causal connection between the trauma and the meningoenceph-

alitis, as it is that there could be?" The witness answered: "I simply do not know." The record shows that the opinion of Dr. Stuttle, as well as the opinion of Dr. Roark, that there might be a causal connection between the trauma of October 1, 1956 and the subsequent meningoencephalitis, was based upon the assumption that the brain or spinal cord was injured as a result of the collision on October 1, 1956. The evidence is otherwise, Dr. Roark made no finding that plaintiff sustained any brain or spinal cord damage. The opinion of an expert is to be allowed only if it is based on and supported by facts in evidence. (Kanne v. Metropolitan Life Ins. Co., 310 Ill App 524, 530, 34 NE2d 732; Schwartz v. Peoples Gas Light and Coke Co., 35 Ill App2d 25, 181 NE2d 826). The record in connection with the testimony of these Doctors is such that the defendant is entitled to have the issues in this case submitted to another jury.

As an additional reason for reversing this judgment it should be noted that the verdict in this case was returned and judgment rendered thereon on November 14, 1960. On December 7, 1960 defendant's post-trial motion was filed. On January 4, 1961, plaintiff moved for leave to file an amendment to his complaint which charged defendant (a) with permitting the brakes on his motor vehicle to become in a state of disrepair, and, (b) with failure to properly maintain the brakes on his motor vehicle. This motion was not heard until March 30, 1961. February 20, 1961, defendant's post-trial motion was heard and denied. On March 10, 1961 defendant filed his notice of appeal, together with his approved appeal bond and proof of service on plaintiff's counsel.

At the hearing on March 30, 1961 of plaintiff's motion for leave to amend, the matter was taken under advisement. On April 6, 1961 the motion for leave to

amend was allowed and the amendment to the complaint was filed. On the same day, April 6, 1961 the Report of Trial proceedings was filed and April 10, 1961 the transcript of the record on appeal was duly certified by the Clerk of the Circuit Court.

This appeal was perfected on March 10, 1961, when the notice of appeal was filed in the trial court. (Ill Rev Stats c 110, § 76.) When that is done the case proceeds in this court, not as a new case but as a continuation of the one that was pending in the trial court, and the jurisdiction of this court attaches when the notice of appeal was filed in the trial court and we have no jurisdiction to consider any proceeding of the lower court after notice of appeal was filed and served. The only questions which this court can consider on this appeal are those existing when the notice of appeal was filed. Therefore, the order of the trial court made on April 6, 1961 granting plaintiff's motion for leave to amend his complaint was made when that court did not have jurisdiction and is void. (American Smelting & Refining Co. v. City of Chicago, 409 Ill 99, 98 NE2d 710; Wolcott v. Village of Lombard, 387 Ill 621, 57 NE2d 351; Brehm v. Piotrowski, 409 Ill 87, 98 NE2d 725.)

We are not unmindful of the provision of Rule 50 of the Supreme Court to the effect that a reviewing court may, of its own motion, before or after submission of a case, order an amendment to the pleadings. The record discloses that during the conference on instructions the attention of counsel for both parties was directed to the fact that the complaint made no charge of negligence concerning the maintenance "of the brakes on defendant's car." The record further indicates that the plaintiff then considered an amendment to his complaint but took no steps to do so until almost a month after defendant's post-trial motion was filed.

It is also insisted that the court erred in giving to the jury the following instruction which told the jury that the words "proximate cause" whenever used in the instructions, "means that cause, which in natural unbroken sequence produced the result complained of. It need not be the sole cause, nor the last or nearest cause, it is sufficient if it concurs with some other cause acting at the same time which, in combination with it, causes the injury or damage complained of."

■■ Counsel for appellant state that the first sentence of this instruction states the law but insists that there is no evidence on which to base the later part of the instruction. This instruction is substantially the same as IPI Instruction 15.01. The note following the instruction in I.P.I. states, however, that this instruction should be used only when there is evidence of a concurring or contributory cause to the injury, that is, where there is evidence of acts or omissions other than acts or omissions of the defendant. Where there is no evidence of a concurring or contributory cause, only the first sentence of this instruction should be given. In Budovic v. Eschbach, 349 Ill App 163, 110 NE2d 477 this court held that under the facts in that case the trial court did not err in refusing to give this instruction. In the instant case, the negligence of the defendant had to be the sole cause of the injury to the plaintiff because defendant was the only one involved in driving the car and there could be no other cause acting at the same time, or in combination, which might have caused plaintiff's injury. This instruction as tendered should have been refused.

■■ The determinative question in this case is whether the occurrence on October 1, 1956 cause the meningoencephalitis infection suffered by plaintiff on December 29th or 30th, 1956. This is a medical question. For the reasons indicated justice requires a re-

versal of this judgment so that a new trial can be had under appropriate pleadings, proper instructions and competent evidence which will not be subject to the criticism indicated herein.

Judgment reversed and cause remanded.

McNEAL and SMITH, JJ., concur.