PEGGY M. JEFFERS *et al.*, Plaintiffs-Appellees, v. JESSE M. WEINGER, M.D., *et al.*, Defendants-Appellants.

Third District   No. 3—84—0233

Opinion filed March 21, 1985.

Lyle W. Allen and Mark D. Howard, both of Heyl, Royster, Voelker & Allen, of Peoria, for appellants.

Raymond C. Rose, Ltd., of Peoria, for appellees.

JUSTICE STOUDER delivered the opinion of the court:

Plaintiffs, Peggy Jeffers and Philmon Jeffers, brought suit against the defendants, Dr. Jesse Weinger, an orthopedic surgeon specializing in back surgery, and the Orthopedic Surgery Group, S.C., in the circuit court of Peoria County alleging medical malpractice. The jury returned a verdict in plaintiffs' favor, and defendants appeal.

In March 1977, Peggy began experiencing back problems. Her condition was diagnosed as a herniated disc by Dr. Weinger, who per-

formed back surgery at that time. In 1979, Peggy again began experiencing back pain which was again treated by Dr. Weinger, this time without the need of further surgery. Neither of these events is at issue in the present appeal.

On August 11, 1980, Peggy had a severe recurrence of her back problem and had to be admitted to Methodist Medical Center. On August 26, Dr. Weinger performed a laminectomy and discectomy. The following afternoon Peggy complained to a nurse of numbness in her right leg. Later that evening she again complained of numbness. At 8 p.m. the charge nurse on the orthopedic floor called Dr. Weinger and reported that Peggy had been complaining of numbness in her foot and leg. Dr. Weinger advised the nurse to keep an eye on Peggy, monitor her carefully, and let him know if there was any change. Peggy complained of numbness once again at 10 p.m., but no further calls were made to Dr. Weinger.

Dr. Weinger saw Peggy at approximately 8 a.m. the following morning, August 28, 1980. He examined her and found an unusual sensory loss from the groin all the way down to her toes on her right side, with intact sensation on her left side. There was also motor weakness and paralysis on the right leg, while the left leg was normal. Peggy's abdomen was distended and she had to be catheterized. A large volume of urine was removed. Upon examining Peggy, Dr. Weinger found that a neurological deficit existed and made a differential diagnosis that Peggy had a probable bleed in the wound site. He then ordered blood chemistry tests. As a result of his examination and the tests, Dr. Weinger decided surgery was necessary and he reoperated at approximately 5 p.m. on August 28 and removed a blood clot. It is undisputed that the blood clot was compressing a bundle of nerve roots called the *cauda equina*. These nerve roots serve all of the body from the hips downward, and transmit sensation and motor power or muscle power to the legs and lower extremities. They also control the bladder, bowels and sexual functions. The loss of function in the *cauda equina* is referred to as cauda equina syndrome, from which Peggy now suffers.

Following surgery on August 28, Peggy still had no feeling in her leg and she could not move it. Dr. Weinger advised her that in time her condition would improve. Peggy began having bladder problems when she left the hospital, and she consulted a urologist for this disorder. She no longer has any sensation that she has to urinate. When she does urinate, she is unable to completely void her bladder and, consequently, she has to catheterize herself twice every day. Also since August 28, 1980, she has had only two natural bowel move-

ments. She has to try from one to four enemas to produce a bowel movement. Sometimes this is not sufficient, and she has to manually remove the fecal material. Peggy also suffers from electrical shocks which shoot up her right leg, and she has developed a neurological ulcer on her heel. Further, she has no sensation in the right side of her pubic and vaginal area, which has affected her sexual relationship with her husband. At the time of trial Peggy could walk; however, she favored her right leg and sometimes required the use of crutches.

Defendants moved for a directed verdict at the close of plaintiff's case in chief and again at the close of all evidence. Both motions were denied. The jury returned a verdict in favor of Peggy in the amount of $800,000 and in favor of her husband in the amount of $100,000 (loss of consortium) and against both defendants. Following the denial of timely post-trial motions for a new trial or judgment *n.o.v.*, this appeal was taken. For the following reasons, we affirm the decision of the circuit court of Peoria County.

The defendants have presented the following issues for our review: (1) whether the testimony of plaintiffs' experts was based upon a false assumption resulting in plaintiff's failure to meet their burden of proof with regard to defendant doctor's alleged malpractice on August 27, 1980; (2) whether the plaintiffs failed to meet their burden of proof regarding causation of Peggy's injuries with respect to activities on August 28, 1980; (3) whether the defendant doctor's judgment regarding Peggy's treatment can be characterized as negligent; (4) whether the defendant, Orthopedic Surgery Group, S.C., was a proper party defendant; (5) whether the trial court erred in allowing testimony regarding the possible loss of a foot; (6) whether the trial court erred in failing to read an entire evidence deposition; (7) whether the trial court erred in giving a certain jury instruction; and (8) whether the trial court erred in allowing jury verdicts which were not itemized to reflect monetary distribution among economic loss and noneconomic loss.

No claim of medical malpractice was made by plaintiffs regarding Dr. Weinger's skill in performing either surgery. Nor was any claim made that the blood clot which caused the cauda equina syndrome was the result of any negligence. The only claim made in the instant case is that Dr. Weinger's activities on the night of August 27 and his delay in reoperating on August 28 constituted negligence.

The first three assignments of error relate to claims by the defendants that the evidence was insufficient to support the verdict of the jury and consequently the trial court erred in denying their motions for directed verdicts and their post-trial motions. The rules re-

garding the standard of review in determining the sufficiency of the evidence have been called to our attention, have been considered, and have been applied to the facts disclosed by the record and the claims of the appellants. See *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504; *Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779.

Although stated separately, the defendants' arguments on the sufficiency of the evidence are interrelated and are specifically directed at either the inadmissibility or incompetence of the testimony of the plaintiffs' experts or at the failure of such expert testimony to support any claim of negligence proximately causing Peggy's injuries.

■ Defendants contend that plaintiffs' experts based their respective opinions of malpractice on inaccurate data and presumed facts. Defendants claim this expert testimony should not have been considered by the jury, relying on *Butler v. Palm* (1962), 36 Ill. App. 2d 351, 184 N.E.2d 633, and *Logsdon v. Baker* (D.C. Cir. 1975), 517 F.2d 174, for the general proposition that a plaintiff cannot meet the burden of proof required when that person's expert bases testimony on inaccurate data. The gist of this argument is that both experts, Drs. Clarence Fossier and Saul Frankel, were under the impression that Dr. Weinger was informed on the evening of August 27 that Peggy had complained of "progressive" numbness in her right leg when, in fact, the term "progressive" was not used or charted by any nurse that night.

The record initially discloses Dr. Frankel never testified as to "progressive" numbness during direct examination nor did defendant mention "progressive" numbness on cross-examination. Therefore, there is no basis in defendants' argument that Dr. Frankel's opinion was based upon a false assumption.

Dr. Clarence Fossier, an orthopedic surgeon, testified in behalf of the plaintiffs and on direct examination the following questions and answers occurred:

"Q. Doctor, did you, at my request, review certain materials in connection with this case?

A. Yes, sir.

Q. Okay. And what materials did you receive from me?

A. I had hospital records, I had Dr. Weinger's deposition. I have subsequently seen depositions from some of the other physicians, I had—I believe that's the extent of it.

Q. Doctor, based upon those materials do you have an opinion based upon a reasonable medical certainty, based upon your knowledge, experience, and training in the area of back sur-

gery whether the care extended by the defendant, Jessie Weinger in this case to Peg Jeffers was within the standard of care of a reasonably careful back surgeon performing such services in the same or similar circumstances in a community similar to Peoria, Illinois?

A. I do not think it was.

Q. Do you have an opinion, first?

A. Yes, sir, I do.

Q. And what is your opinion?

A. I think it did not conform to the standards as you outlined.

Q. And what are the reasons for your opinion, Doctor?

A. I think that the evening of the 27th which was slightly more than 24 hours after the surgery Mrs. Jeffers started complaints [*sic*] of tingling and then progressive numbness and weakness in her opposite leg. I believe according to the records Dr. Weinger was informed at about 8:00 o'clock in the night, did not come in and see the patient."

During defendant's cross-examination of Dr. Fossier, the following questions and answers appear in the record:

"Q. Is it a part of your opinion that progressive numbness was reported to Dr. Weinger?

A. That is my understanding, sir.

Q. And if that understanding is incorrect that would change your opinion then, wouldn't it?

A. That would temper my opinion about that evening."

Defendants actually clarified by use of cross-examination that Dr. Fossier was possibly relying to a certain degree on an inaccurate assumption; however, they were unable to persuade him to change his opinion. Therefore, any possibility that Dr. Fossier based his opinion on an incorrect assumption was nullified when the defendants clarified the situation on cross-examination. Further, the cases cited by the defendants are not dispositive of this issue, because in neither case was the inaccurate assumption disclosed to the expert allowing that person to change his opinion based upon a correct understanding of the legally significant facts. Additionally, the *Logsdon* court did not find an inaccurate assumption relied upon by the expert, but rather reversed the case to determine if he had. 517 F.2d 174, 175.

■ Next, we consider whether there was sufficient evidence from which it may be inferred that Dr. Weinger's conduct was negligent and proximately caused Peggy's injuries. These issues nearly always involve or result in a duel of the experts, with the jury determining to

whom the trophy should be awarded.

Plaintiffs' experts testified that the standard of care received by Peggy was not satisfactory and did not meet acceptable standards. Dr. Frankel testified that when the defendant examined Peggy on the morning of August 28, 1980, and determined there was a blood clot present causing paralysis to the right leg and bladder, Dr. Weinger had a "flat out" emergency on his hands, yet he failed to reoperate and take appropriate action for another 10 hours. Dr. Frankel further testified that if surgery would have been performed immediately, the outcome would have been much more favorable. Dr. Fossier testified that in his opinion the outcome would have been favorable if the surgery had been done promptly. Dr. Weinger's testimony as well as that of two experts, Drs. Steward Bailey and Bernard Finneson, testifying in his behalf, presented contradictory opinions indicating that Peggy's injuries were not the result of any delay in performing the second operation and, furthermore, that the decision not to operate earlier was one of judgment and not one of negligence.

Defendants have directed our attention to *Spike v. Sellett* (1981), 102 Ill. App. 3d 270, 430 N.E.2d 597, which in addition to setting forth the elements required to be proved in a medical malpractice case, concluded that as a matter of law the elements had not been proved. However, in the instant case there were, as we have earlier seen, contradictory opinions of experts, thereby presenting issues properly submitted to and resolved by the jury. The jury was asked to decide which experts to believe, and they chose plaintiffs'. The jury's resolution of these issues was supported by sufficient evidence, and we find no error in the judgment of the trial court based on such verdict.

■ Turning then to a consideration of whether Orthopedic Surgery Group, S.C., was a proper party defendant, defendants argue that the act under which the corporation was formed does not provide that a medical corporation shall be liable for negligence of the licensed practitioners who formed it. While the record is not clear which corporation act the group was formed under, the letters "S.C." following the group's name indicate it was formed under the Medical Corporation Act (Ill. Rev. Stat. 1981, ch. 32, par. 631 *et seq.*).

Section 3 of the Medical Corporation Act states, *inter alia*, that "[t]he Business Corporation Act *** shall be applicable to such corporations *** and they shall *** be subject to the duties, restrictions and liabilities of other corporations, except so far as the same may be limited or enlarged by this Act." (Ill. Rev. Stat. 1981, ch. 32, par. 633.) The Business Corporation Act is silent as to the liability of the

corporation for the acts of its employees; however, the law is well settled that a corporation may be held liable for torts committed by its servants, agents, or employees in the course of their employment. See *Pfeffer v. Farmers State Bank* (1931), 263 Ill. App. 360.

Defendant doctor was employed and paid a salary by defendant corporation. We see no reason why the doctrine of *respondeat superior* should not be applied to a corporation chartered under the Medical Corporation Act. Therefore, the trial court did not err in denying a directed verdict for defendant corporation.

■ The next issue raised is whether the trial court erred in allowing testimony concerning the possible loss of Peggy's foot. Defendants contend it was reversible error to allow Dr. John Wood to testify that it "was within the realm of possibility" plaintiff could lose her foot as a result of a neurological ulcer on the heel. Defendants argue this statement was prejudicial because the neurological ulcer was never causally related by any medical expert to any alleged acts of negligence and, further, it was speculative. We disagree.

Dr. Wood is a medical doctor specializing in plastic and reconstructive surgery. As such, he qualifies as an expert concerning the testimony he gave in this trial. He testified for Peggy that the neurological ulcer on her foot developed "because of some sort of loss of sensation in the foot," and that "[s]he had numbness of her foot and this is a reason for getting an ulcer." This was admissible as competent medical testimony as to some of the consequences flowing from Dr. Weinger's negligence.

Defendants base their speculation argument on Dr. Wood's crossexamination answer that the possibility of Peggy's losing her foot is less than 1%. We find that whether there is a 1% possibility or a 99% possibility, each is an element of damage which should be considered by the jury.

■ Defendants next argue the trial court erred by refusing to allow them to read the entire evidence deposition of Dr. Finneson to the jury. They contend this refusal prejudiced the outcome of the case. That portion of the deposition excluded concerned the cross-examination of Dr. Finneson by the Methodist Medical Center, then a party defendant. Subsequent to the taking of this deposition but prior to trial, the hospital settled with the plaintiffs and was dismissed from the case. The hospital's questioning disclosed information concerning the dangers involved in resubmitting a patient to a second operation which closely follows the first operation. The trial court excluded these questions in the deposition for the sole reason they were elicited by the use of leading questions, while at trial defendants were reading

the deposition as direct testimony. Our review of the record, however, discloses that the same information was elicited at trial through other testimony. This being the case, whether such ruling was or was not erroneous is of no concern since it could not have resulted in prejudice and reversible error.

■■ Defendants claim the issues instruction given as plaintiffs' instruction No. 16 (based on Illinois Pattern Jury Instructions, Civil, No. 20.01 (2d ed. 1971)) is not supported by the evidence. This instruction provided:

> "The plaintiffs claim that they were injured and sustained damage, and that the defendants were negligent in one or more of the following respects:
>
> a. Failed to properly monitor the plaintiff following surgery;
>
> b. Failed to recognize the significance of symptoms exhibited by plaintiff following surgery;
>
> c. Failed to perform remedial surgery immediately upon learning of plaintiff's complaints;
>
> d. Failed to instruct hospital personnel of the significance of certain complaints.
>
> The plaintiffs further claim that one or more of the foregoing was a proximate cause of their injuries.
>
> The defendants deny that they were negligent and deny that any claimed act or omission on the part of the defendants was a proximate cause of plaintiffs claimed injuries. The defendants further deny that the plaintiffs were injured to the extent claimed."

As we have previously stated, the testimony given by the parties' experts presented questions of fact to be determined by the jury. The purpose of an issues instruction is to inform the jury of plaintiffs' claims and defendants' response. An issues instruction is taken from the plaintiffs' complaint and the defendants' answer. It is proper so long as it is succinctly stated without undue repetition or emphasis. (See *Signa v. Alluri* (1953), 351 Ill. App. 11, 113 N.E.2d 475.) It is error to give instructions where there is no evidence on which to base the instructions. (*Magill v. George* (1952), 347 Ill. App. 6, 105 N.E.2d 808.) We believe there was sufficient evidence for the giving of this instruction.

■■ Finally, defendants argue that the trial court erred in allowing jury verdicts which were not itemized to reflect monetary distribution between economic loss and noneconomic loss as required by section 2—1109 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch.

110, par. 2—1109). Defendants never objected to the form of verdict or required the tender of an itemized verdict. Therefore, the defendants have waived this issue on appeal. (See *Robinson v. Greeley & Hansen* (1983), 114 Ill. App. 3d 720, 449 N.E.2d 250.

Accordingly, for the foregoing reasons the judgment of the circuit court of Peoria County is affirmed.

Affirmed.

HEIPLE and BARRY, JJ., concur.