SCOTT A. RODDA, Plaintiff-Appellee, v. BRUCE WHITE et al., Defendants-Appellants.

Second District    Nos. 2—91—0193, 2—91-0217 cons.

Opinion filed December 17, 1991.

990

Madden & Sisler, of Freeport (James G. Madden, of counsel), for appellant Bruce White.

William R. Shirk, of Weinstine & Shirk, of Morrison, for appellant Michael Gay.

Peter T. Sullivan III, of Rockford, for appellee.

JUSTICE INGLIS delivered the opinion of the court:

In these consolidated appeals, defendants, Bruce A. White and Michael Gay, appeal from a jury verdict in favor of Scott A. Rodda, plaintiff. Rodda was injured in the early hours of October 1, 1988, when he fell from the elevated bucket of a utility truck driven through the streets of Savanna by either White or Gay. Rodda was knocked out of the bucket after his forehead hit an overhead wire. All three individuals admit to extensive drinking prior to the incident. Plaintiff's claims against two other defendants, the Herbst Grain

Company and Jack Swanson, Inc., were dismissed by order of the trial court on September 25, 1990.

The 12-member jury found plaintiff's total damages to be $210,000. The jury determined plaintiff to be 30% at fault, White 40% at fault and Gay 30% at fault. The jury then found Rodda's recoverable damages, his total damages reduced by his percentage of fault, to be $147,000. Each defendant made a separate and timely appeal, which this court consolidated on July 15, 1991. Defendants' claims on appeal can be summarized as follows: (1) improper and prejudicial instructions were given to the jury; (2) the jury's comparative negligence determinations were against the manifest weight of the evidence; and (3) the $210,000 award was excessive. We affirm.

We begin our analysis by presenting a rather detailed recitation of the relevant trial testimony because defendants argue in part that the verdict was against the manifest weight of the evidence. Ten witnesses testified at the two-day trial. Plaintiff called George Heffelfinger as his first witness. Heffelfinger testified that in the early hours of October 1, 1988, he was leaving the parking lot of a Savanna supermarket when he saw a boom truck on Main Street with someone riding in and yelling from the bucket attached to the boom. Heffelfinger followed the truck in his car as the truck proceeded north on Main Street. The boom was partially raised, but Heffelfinger could not tell how high. He estimated the truck was travelling at about 20 to 25 miles per hour. At the next intersection, Main Street and Jefferson, Heffelfinger saw the individual in the bucket fall to the ground after apparently hitting one of the overhead wires.

Plaintiff next called Charles Sipes. Sipes operates Charlie's Country Lounge in Savanna. Sipes testified that he closed the bar in the early hours of October 1. At closing time, he saw Rodda, White and Gay leave the bar and walk toward the boom truck parked in back of the bar. As Sipes was leaving in his car, he could hear the hydraulic cylinder from the boom "going up and down."

Bruce White testified that he was celebrating his 27th birthday on Friday night, September 30. At the time, he was location manager for the Herbst Grain Company, the owner of the boom truck. He met Rodda and Gay between 9 and 10 p.m. at Bahr's Bar.

Sometime while at Bahr's, White testified that he gave Gay permission to borrow the boom truck for work the next day. White testified that Gay then brought the truck back to Bahr's, sometime after which the trio departed for Charlie's Lounge. According to White, Gay drove the boom truck to Charlie's with White and Rodda as passengers in the cab. They arrived at Charlie's after the bar had

stopped serving alcohol. White used the restroom there, after which the trio left Charlie's. White could not remember anything after they left Charlie's. He was not sure who drove the truck after Charlie's.

Plaintiff's attorney then proceeded to impeach White by reading extensively from White's earlier deposition. At his deposition, White stated that Gay drove the boom truck after they left Charlie's and that White was a passenger. He also testified at his deposition that after they left, he noticed that the boom was up and asked Gay to pull over so that White could lower it. At his deposition, White stated that Gay was lying when Gay said White was driving the boom truck at the time.

White testified that any inconsistencies between his deposition and his trial testimony were because he was "covering up," apparently referring to his deposition testimony. In answer to questioning about the "cover up," White twice testified that: "I don't know what the truth is." When asked if he lied at his deposition, White responded: "I don't know if I lied. That might be the truth." In response to many questions about the incident, White claimed that he did not remember what happened due to his intoxicated state.

White did not remember anything about a red activation light or a master switch for the boom in the cab of the truck. However, plaintiff's attorney impeached White by reading part of his deposition testimony to the jury. In his deposition, he indicated a fairly good understanding of how the switch activates the boom's hydraulic system and how the red light indicates when the switch is on.

Michael Gay testified that he was acquainted with the control panel that can move the bucket on the truck in various directions because of his past employment with the Herbst Grain Company. He did not remember what each button did or whether a red activation light in the cab of the truck was working at the time of the accident. Plaintiff's attorney then proceeded to impeach Gay by reading part of Gay's deposition testimony to the jury. In his deposition testimony, Gay stated that the red light in the cab was "pretty bright" and "impossible to miss." He further stated that the light "always worked fine," including a day or so prior to the accident when he had borrowed the truck.

Gay testified at trial that on the evening in question he and Rodda met White at Bahr's. Gay testified that White drove all of them to Charlie's in the boom truck and that they arrived at about 2 a.m., at which time the bar was closing up. All Gay can remember after stopping at Charlie's is climbing into the passenger side of the boom truck and passing out. The next thing he remembered was White stopping

to lower the boom after the accident. He drove by the accident site later, apparently in his own pickup truck, and was thereafter cited for driving under the influence. He took a breathalyzer test at that time which indicated a .17 level of alcohol in his blood. Gay testified that he was not driving the boom truck at the time of the accident, but that he told the police officer at the scene that he was the driver because he wanted to "keep his job" and "cover" for White.

Gay stated that there are two control panels which govern movement of the boom, one attached to the bucket and the other located inside the rear driver side panel of the truck. He testified that there were controls inside the cab, consisting of a master switch and a red light, but that the master switch had possibly been bypassed. Gay admitted that it was dangerous to operate the boom truck while the bucket was elevated.

Scott Rodda testified that on the evening in question Gay called Rodda for a ride from work because Gay's pickup truck had broken down. Rodda, 27 years old at the time, had just put in a full work day as a farm manager at a local farm. His average weekly gross pay was $375. Rodda testified that the two went to Bahr's Bar for a few beers, then to the Upper Deck Lounge, and then back to Bahr's. At some point while at Bahr's they met White, who gave Gay permission to borrow the boom truck so that Gay could get to work the next day. The trio then went to Charlie's. After they discovered that they had missed the last call, they returned to the boom truck, which was parked behind Charlie's. Rodda testified that either White or Gay asked him if he wanted to get into the bucket and go up to look around, which Rodda agreed to do. Rodda got into the bucket and next remembered hearing a door slam and feeling the truck begin to move. As the truck took a winding route around Savanna, Rodda testified that he was yelling to be let down. En route, the truck stopped momentarily in Captain Walt's parking lot but then continued driving through Savanna. Rodda testified that at the intersection of Main and Jefferson he was knocked out of the bucket onto the street after his forehead hit an overhanging wire.

Rodda stated that he was in the hospital for 25 days as a result of the accident. He suffered numerous injuries, lacerations and a concussion from the accident. Scars remain on his forehead, leg and abdomen. Shortly after his hospital stay, Rodda returned to the scene of the accident and spotted three wires hanging across Main Street at Jefferson: a banner wire on the bottom, a telephone wire in the middle and a power line on top. Rodda testified that the banner wire was for the annual Shadfly Fishing Days event in Savanna.

Rodda did not work for 36 weeks after the accident, after which he began working as a farmhand in June 1989. He voluntarily quit that position in December 1989 when he realized that he could not perform many of the job's responsibilities, such as climbing the silo ladder. He was thereafter without work for 14 weeks. Rodda testified that Dr. Plotkin, his surgeon, instructed him not to run, kneel, squat, jump or climb. Rodda stated that he experiences pain every day and that cold weather affects his leg pain.

Rodda testified that he did not know which defendant was driving at the time of the accident, but that he thought White had the keys to the truck. He stated that he voluntarily got into the bucket, but that he never used the controls to move the bucket up or down. Rodda testified that in the last block before the accident he only remembers yelling to White and Gay to be let down. He stated that the bottom of the bucket was approximately 6½ feet from the bed of the truck when he got into the bucket at Charlie's. He apparently used the ladder affixed to the boom to get into the bucket.

Plaintiff introduced Dr. Martin Plotkin's deposition testimony into evidence. Plotkin, an orthopedic surgeon, treated Rodda's leg injuries. Plotkin testified that Rodda had multiple fractures of the right femur extending into the right knee joint. Plaintiff underwent three surgical procedures, the third being a five-hour procedure. In that third procedure, Plotkin performed an open reduction of the fractured femur, took a bone graft from the pelvis to fill in missing area of bone, and inserted a 16-hole plate to hold the femur together. A 20-inch scar remains on Rodda's leg. Plotkin opined that Rodda will have to have the plate surgically removed in a few years at an approximate cost of $7,300. He also opined that Rodda will eventually require a total knee replacement. Plotkin further testified that he advised Rodda not to participate in any sports activities or any heavy labor and to avoid squatting or kneeling.

Following Plotkin's testimony, plaintiff's medical bills were admitted into evidence. Plotkin referred to the bills in his testimony, stating that he had reviewed them and that they were fair and reasonable. The bills consisted of 18 itemized statements from various health care providers. The total amount of the bills is $40,193.17.

Dennis Penick was the first defense witness. Penick testified that as he drove through Savanna on his way home right after bar time on October 1, he saw the boom truck parked in Captain Walt's parking lot. He stated that the boom was in the down position. He noticed one gentleman in the bucket and a male driver, and both men appeared to be in conversation.

Kim Kauffman, local manager for the telephone company that serves Savanna, testified that he was reasonably familiar with all of the telephone wires in the Savanna area. Referring to a company record, he testified that a new telephone cable had been strung across Main Street at Jefferson on February 18, 1988. Kauffman also noted the existence of a three-eighths-inch strand of copper weld at the same location, a couple of inches below the telephone wire. Kauffman assumed that the copper weld wire was used to hang a banner for Shadfly Fishing Days because there were tie wires on it. The copper weld cable was removed by the telephone company on October 12, 1988, according to Kauffman.

Robert Collins, a construction foreman for the same telephone company, was the next defense witness. His testimony paralleled that of Kauffman. Using the same company record that Kauffman had used earlier, Collins gave various clearance heights of telephone wires in the Savanna area, some heights which he had measured the day he testified. He testified that the height of the telephone wire at Main and Jefferson was 18 feet 3 inches. Collins testified that the bottom strand between the telephone poles at that location, which was a couple of inches below the telephone wire, was copper weld wire and probably used for a Shadfly Days banner.

Jack Mendel, a physical therapist, was the last defense witness. Mendel began treating Rodda to rehabilitate his right leg late in October 1988. Rodda's treatment consisted of three visits a week with Mendel and a home-exercise program. Mendel last saw Rodda on February 23, 1989. Mendel testified that Rodda rarely reported pain or discomfort in his leg during the treatment visits. However, Mendel also testified that each treatment consisted of stretching the muscles to the point of discomfort and not beyond. He stated that Rodda's leg injury was a "very complicated involved fracture." Mendel testified that Rodda progressed through various types of exercises such as stationary bicycling and leg lifts. On January 19, 1989, Rodda rode four miles in 15 minutes; on January 26 he rode five miles in 16 minutes; on February 9 and 16 he rode 10 miles in 22 minutes; and on his final visit on February 23, he rode 24 miles in 40 minutes. Mendel testified that by Rodda's last visit the flexibility of his right leg was in a normal range of movement, he could bear full weight on it, his balance was good, and his endurance was functional.

## JURY INSTRUCTIONS

We first address defendants' allegations that improper and prejudicial jury instructions were given. We note at the outset that neither

White nor Gay included a complete copy of the disputed jury instructions in the argument section of his brief or in an appendix. "In such a situation, a court of review will not search the record to find whether any error has been committed in the giving or refusal of instructions." (*Quagliano v. Johnson* (1968), 100 Ill. App. 2d 444, 451.) We believe that an attorney should plainly set out a challenged jury instruction in his brief to the court. However, we note that our supreme court has frowned upon such an application of the waiver rule in *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 338. For the purpose of this opinion, we will assume that defendants properly set out the disputed instructions in their briefs.

■ Defendants allege error with instructions 1, 2, 4, 5 and 6A. However, White limited his argument to instructions 4 and 6A while Gay confined his argument solely to instruction 6A. Having failed to argue error in instructions 1, 2 and 5, defendants have waived our consideration of error in those instructions. (*People v. Salazar* (1988), 126 Ill. 2d 424, 463-64.) Furthermore, defendant White's 2½-half-page argument section regarding the instructions contains no citation to authority. Argument not supported by relevant authority waives the issue on appeal. (*State Farm Mutual Automobile Insurance Co. v. Haskins* (1991), 215 Ill. App. 3d 242, 248.) We therefore limit our review to instruction 6A, an issues instruction.

Defendant Gay contends that instruction 6A (see appendix), which is based on Illinois Pattern Jury Instructions, Civil, No. 20.01 (3d ed. 1990) (hereinafter IPI Civil 3d), improperly characterized the defendants as having joined together to trick or hurt plaintiff and that this court must therefore reverse and remand for a new trial. We disagree.

Both defendants objected to instruction 6A, a modification of plaintiff's original instruction 6, at the jury instruction conference. The following colloquy occurred:

"THE COURT: Plaintiff's Six A is the one we modified ourselves. Is there an objection remaining to Plaintiff's Six A?

MR. SHIRK [Gay's attorney]: That is IPI 20.01?

THE COURT: IPI 20.01, correct.

MR. MADDEN [White's attorney]: Yes. The objections are that it sets forth some claims in Paragraphs A through H which are not supported by the evidence. Particularly C, 'That the defendants were negligent in ignoring lighted warnings inside said vehicle not to drive said vehicle.' There has been no testimony that was what those lights or light was for. Also, D, 'Drove said vehicle at a speed that was excessive given the cir-

cumstances.' The only testimony of speed was, I believe, twenty or perhaps twenty-five miles an hour and I believe that's improper. We do not believe that F, G, H and I have a foundation in the evidence because they say 'solely or in concert' and all that is, is a restatement of some of the prior subparagraphs and the evidence would not support F, G, H and I.

THE COURT: Do you join in that?

MR. SHIRK: Yes, I do, Judge.

THE COURT: All right. Six A is given over objection."

For guidance on this issue, we note that Supreme Court Rule 239(b) provides, in part, that the "grounds of the objections [to jury instructions] shall be particularly specified." (134 Ill. 2d R. 239(b).) Furthermore, Supreme Court Rule 366(b)(2)(i) provides "[n]o party may raise on appeal the failure to give an instruction unless he shall have tendered it." (134 Ill. 2d R. 366(b)(2)(i).) Our supreme court has recently analyzed both rules, holding:

"To preserve an objection to a jury instruction a party must both specify the defect claimed and tender a correct instruction. [Citations.] It is the responsibility of the party challenging a jury instruction to submit an instruction to the trial judge that states the law for which he argues on appeal. If the defendants believed that the jury instructions used in this case were incorrect, incomplete, or otherwise inadequate, it was their duty to object to the instructions and to offer their own remedial versions." *Deal v. Byford* (1989), 127 Ill. 2d 192, 202-03.

Applying those rules here, we are perplexed because while the record shows that defendant White tendered his version of IPI Civil 3d No. 20.01, which was not given, we fail to find a tendered issues instruction offered by defendant Gay, whose objection we are now considering. We could, therefore, find that defendant Gay has waived his objection to instruction 6A. Assuming, *arguendo*, that Gay sufficiently preserved his objection to instruction 6A, we find no error in the instruction. The purpose of IPI Civil 3d No. 20.01 is to summarize the issues in dispute between parties to a negligence action. (*Jeffers v. Weinger* (1985), 132 Ill. App. 3d 877, 885.) It is proper so long as it is succinctly stated without undue repetition or emphasis. (*Jeffers*, 132 Ill. App. 3d at 885.) The instruction properly characterized plaintiff's allegations of negligence and defendants' defenses, without unduly emphasizing that White and Gay joined together against Rodda. The jury was not misled by the instruction. We find no error in instruction 6A.

COMPARATIVE NEGLIGENCE

Defendants argue that the jury's comparative negligence determinations are against the manifest weight of the evidence. Defendant Gay argues that the jury's determination that he was 30% negligent was improper since he was only a passenger in the truck. Gay also argues that plaintiff should be denied any recovery because plaintiff was more than 50% at fault. Defendant White argues that plaintiff's actions alone, rather than defendants', were the proximate cause of plaintiff's injuries. White also argues that Gay, as a passenger in the boom truck, was not negligent and that the jury verdict must therefore be reversed. We disagree.

A jury finding in a comparative negligence case will not be set aside on the ground that it is against the manifest weight of the evidence unless the opposite result is clearly apparent. (*Johnson v. Colley* (1986), 111 Ill. 2d 468, 474.) This court will not reverse a jury verdict simply because different inferences or conclusions could be drawn from the evidence. (*P.A.M. Transport, Inc. v. Builders Transport, Inc.* (1991), 209 Ill. App. 3d 889, 892; *Shuster v. Brantley* (1990), 198 Ill. App. 3d 905, 908.) The issue of proximate cause is also within the province of the jury as trier of fact. *Scott & Fetzer Co. v. Montgomery Ward & Co.* (1986), 112 Ill. 2d 378, 393.

■ We note that when the trial judge denied defendants' post-trial motions, the judge stated:

> "[H]aving tried the case and listened to the testimony and having observed the witnesses, it was partially a question of credibility and partially a question of believing who had the most memory to recall what happened, and I think the cross-examination and arguments clearly pointed [*sic*] the weaknesses on either side's case. The Jury had a clean case to decide and * * * everyone got their points in and got their versions before the Jury and the Jury decided it this way."

We agree. This was indeed a factually complicated case for the jury, with conflicting testimony on many key elements of the story such as who was driving the boom truck and what happened in the parking lot at Charlie's. But we cannot agree with defendants that the jury verdict is against the manifest weight of the evidence.

Plaintiff has cited eight cases from other States in support of his argument that the jury verdict was proper. Plaintiff, however, failed to provide four copies of each case as Uniform Appellate Rule 8 (Ill. Rev. Stat. 1989, ch. 110A, par. 908) requires, and we therefore need not consider them. *Chapman v. Foggy* (1978), 59 Ill. App. 3d 552, 557.

Both defendants devote much argument to the confusion surrounding which of them was driving the boom truck at the time that Rodda was knocked from the bucket. However, their theories and arguments on appeal regarding who was driving and who was a passenger are irrelevant. Defendants did not submit special interrogatories at trial. Thus, there is no way of knowing whether the jury assigned White 40% of the negligence, 10% more than Gay, because they made a factual finding that White drove the truck at the time or because they found that White willingly provided his company truck for the occasion. Our supreme court has held: "When there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and the defendant, having failed to request special interrogatories, cannot complain." *Witherell v. Weimer* (1987), 118 Ill. 2d 321, 329.

Defendants also devote much argument to the confusion surrounding the heights of the various overhanging wires in downtown Savanna. Defendants argue that Messrs. Kauffman's and Collin's testimony mathematically established that Rodda raised the boom himself while riding in the bucket and that his actions in doing so were the proximate cause of the accident. We disagree. Rodda testified that he did not move the boom and that he was not acquainted with the controls in the bucket. Rodda also testified that after being discharged from the hospital he spotted three overhanging wires at Main and Jefferson, the lowest being a banner wire for Shadfly Fishing Days. The jury heard conflicting testimony from a variety of witnesses about the position and height of the boom when Rodda got into the bucket and during the drive. We find sufficient evidence to support the jury's verdict and hold that it is not against the manifest weight of the evidence.

### AWARD OF $210,000

Defendants' final argument is that the $210,000 damages award is excessive, unreasonable and unwarranted by the evidence. They argue that Rodda has for the most part returned to his life as it was prior to the accident. They argue that Rodda's therapist, Jack Mendel, testified that Rodda has recuperated from the fall and that Rodda rarely complained of pain during the therapy. We find no reason to disturb the award.

The amount of a verdict is generally within the discretion of the jury (*Hollis v. R. Latoria Construction, Inc.* (1985), 108 Ill. 2d 401, 407) and should not be disturbed on review unless it is so large as to indicate passion or prejudice (*Jones v. Karraker* (1983), 98 Ill. 2d 487,

492). "Whether a damage award falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience must be determined from consideration of the permanency and extent of the injury, possible future deterioration, medical expenses, and restrictions on daily activity because of the injury." *Young v. Hummel* (1991), 216 Ill. App. 3d 303, 310.

■■ In the instant case, the evidence before the jury showed that 27-year-old Scott Rodda spent 25 days in the hospital and three months in physical therapy. Rodda suffered numerous injuries, including a horizontal scar on his forehead, a concussion, a fractured femur, and a 20-inch scar on his leg from the surgery. Dr. Plotkin testified that Rodda underwent three surgeries. The last surgery was five hours long and consisted of an open reduction of the fractured femur, as well as a graft from the pelvis and the insertion of a 16-hole plate to hold the femur together. Plotkin testified that Rodda will have to have the plate removed in a few years at a cost of $7,300. Plotkin opined that Rodda will eventually need a complete knee replacement. Plotkin has advised Rodda not to participate in any sports activities or any heavy labor and to avoid squatting or kneeling. Rodda's medical bills were $40,193.17. Rodda testified that he experiences pain every day and that weather affects his leg pain. He was off work a total of 50 weeks and his average weekly gross pay was $375. Therefore, plaintiff sustained a wage loss of $18,750.

In sum, plaintiff incurred $58,943.17 in out-of-pocket expenses. And he will likely incur an additional $7,300 for removal of the plate and an unspecified amount for a knee replacement.

Based on our review of the evidence, we find that the amount the jury awarded as damages is well within the limits of fair and reasonable compensation and will not be set aside.

The judgment of the circuit court of Carroll County is affirmed.

Affirmed.

WOODWARD and GEIGER, JJ., concur.

### APPENDIX
*Jury Instruction No. 6A (IPI Civil 3d No. 20.01)*

"The plaintiff claims that he was injured and sustained damage and that the defendants were negligent in one or more of the following respects:

(a) Began driving said vehicle knowingy [*sic*] that Scott A. Rodda was in the boom of said vehicle without warning to said Scott A. Rodda;

(b) Continued to drive said vehicle knowing that Scott A. Rodda was in the boom of said vehicle;

(c) Ignored lighted warnings inside said vehicle not to drive said vehicle;

(d) Drove said vehicle at a speed that was excessive given the circumstances;

(e) Drove said vehicle under overhead utility wires which they knew or should have known constituted a danger to Scott A. Rodda who was in the boom at said time;

(f) Defendant, Bruce A. White, did solely or in concert with the defendant, Michael Gay, begin driving a boom truck with knowledge that plaintiff, Scott A. Rodda, was in said boom while in the up position without warning or notice to plaintiff, Scott A. Rodda;

(g) Defendant, Bruce A. White, did solely or in concert with Michael Gay, attempt to frighten plaintiff, Scott A. Rodda, by driving the boom truck while the plaintiff, Scott A. Rodda, was in the boom while in the up position;

(h) Defendant, Michael Gay, did solely or in concert with the defendant, Bruce A White, begin driving a boom truck with knowledge that plaintiff, Scott A. Rodda, was in said boom while in the up position without warning or notice to plaintiff, Scott A. Rodda;

(i) Defendant, Michael Gay, did solely or in concert with Bruce A. White, attempt to frighten plaintiff, Scott A. Rodda, by driving the boom truck while the plaintiff, Scott A. Rodda, was in the boom while in the up position.

The plaintiff further claims that one or more of the foregoing was a proximate cause of his injuries.

Each defendant denies that he did any of the things claimed by the plaintiff, denies that he was negligent in doing any of the things claimed by the plaintiff, and denies that any claimed act or omission on his part was a proximate cause of the plaintiff's claimed injuries.

Each defendant further denies that the plaintiff was injured to the extent claimed.

The defendants claim that the plaintiff was contributorily negligent in one or more of the following respects:

(a) Rode in the bucket attached to the boom of the truck in question when he knew or should have known that it was unsafe to do so;

(b) Rode in the bucket attached to the boom of the truck while he was intoxicated;

(c) Rode in the bucket attached to the boom of the truck and caused the boom to be in an elevated position while the truck was moving when he knew or should have known that it was unsafe to do so.

(d) While riding in the bucket attached to the boom of the truck failed to cause the boom to be lowered from its elevated position when he knew or should have known that such failure to act on his part could result in injury to himself.

The defendants further claim that one or more of the foregoing was a proximate cause of plaintiff's injuries.

The plaintiff denies that he did any of the things claimed by the defendants, denies that he was negligent in doing any of the things claimed by defendants, and denies that any claimed act or omission on his part was a proximate cause of his claimed injuries." See IPI Civil 3d No. 20.01.