FIRST DIVISION

Nos. 1-08-3622 & 1-08-3635 Cons.

| | |
|---|---|
| JOSE DIAZ and MARIA DIAZ, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiffs-Appellees and | ) Cook County. |
| Cross-Appellants, | ) |
| | ) |
| v. | ) |
| | ) No. 04 L 2874 |
| LEGAT ARCHITECTS, INC., a | ) |
| Corporation, and THE DURANT | ) |
| COMPANY, a Corporation, | ) |
| | ) |
| Defendants | ) |
| | ) |
| (Boller Construction Company, | ) Honorable Clare Elizabeth |
| Inc., a Corporation, | ) McWilliams, |
| | ) Judge Presiding. |
| Defendant-Appellant and | ) |
| Cross-Appellee and | ) |
| Third-Party Plaintiff- | ) |
| Appellant; | ) |
| | ) |
| Larmco Construction Company, | ) |
| | ) |
| Third-Party Defendant- | ) |
| Appellee and Cross- | ) |
| Appellant). | ) |

PRESIDING JUSTICE HALL delivered the opinion of the court:

The plaintiffs, Jose Diaz, and his wife, Maria Diaz, filed a complaint against defendant Boller Construction Company, Inc. (Boller), for personal injuries he sustained while working on a construction site. Boller filed a third-party complaint against Mr. Diaz's employer, Larmco Construction Company (Larmco), seeking contribution pursuant to the Joint Tortfeasor Contribution Act (740 ILCS 100/1 et seq. (West 2004)). The jury

Nos. 1-08-3622 & 3635 Cons.

returned a verdict for the plaintiffs and against Boller. The jury also returned a verdict for Boller and against Larmco in the third-party suit. After reducing the award by the percentage of Mr. Diaz's negligence, the jury awarded Mr. Diaz $1,246,875 and awarded Mrs. Diaz $50,000 for loss of consortium.

Following the filing of posttrial motions, the trial court ordered a remittitur of the jury award based on the improper admission at trial of future medical costs. The trial court denied the plaintiffs' request to adjudicate Larmco's workers' compensation lien and granted Larmco's motion to dismiss Boller's third-party complaint for contribution. After allowing other setoffs and credits, not at issue in this case, Mr. Diaz's award was reduced to $1,029,270.06, and Mrs. Diaz's award was reduced to $47,500, resulting in a total award of $1,076,770.06.

Both Boller and the plaintiffs have appealed from the judgment in this case. The plaintiffs and Larmco have also filed cross-appeals. This court ordered the consolidation of the plaintiffs' and Boller's appeals and the cross-appeals for purposes of review and decision.[1]

_____

[1]In its cross-appeal, Larmco requested that the plaintiffs' appeal and cross-appeal and Boller's appeal be denied. In the alternative, Larmco requested a judgment n.o.v. be entered in its favor on Boller's third-party complaint or that it be granted a

2

Nos. 1-08-3622 & 3635 Cons.

Boller raises the following issues on appeal: (1) whether Boller's motion for a directed verdict should have been granted or a judgment n.o.v. entered; (2) whether the trial court erred in instructing the jury with the pattern construction negligence instructions; (3) whether trial court errors require a new trial, either individually or cumulatively; and (4) whether the trial court erred in granting Larmco's motion to dismiss Boller's third-party complaint. In their appeal, the plaintiffs contend that the trial court erred in denying their motion to adjudicate Larmco's workers' compensation lien. In their cross-appeal, the plaintiffs contend that the trial court erred in granting the remittitur. Due to the length of the record in this case, we will limit our recitation of the facts to the trial testimony pertinent to the issues raised on appeal.

BACKGROUND

Boller performs general construction and concrete work. It was one of 17 "prime" contractors hired to perform work on the Highland Park High School project (the project). Thereafter, Boller entered into a contract with Larmco to perform the masonry work on the project.

I. Trial Court Proceedings

A. <u>Liability Testimony</u>

---

new trial.

3

In March 2002, Mr. Diaz was 53 years of age, and he was working on the project for Larmco as a laborer. As part of his duties he would assist in the building of scaffolds. Larmco used two kinds of scaffolds, either Non-Stops or Morgans.

On March 19, 2002, Mr. Diaz and the other laborers were working on a Non-Stop scaffold. A laborer named "Al"[2] put an extension on the scaffold. Mr. Diaz explained that, when an extension was added to a scaffold, it was necessary to put up two cross braces. A second extension required two more cross braces and a straight brace at the top. Al told Mr. Diaz that he was only using one cross brace because there was not a lot of material.

In the afternoon, Mr. Diaz was working on the scaffolding with other laborers. There were two types of planks on the scaffold; one for materials, such as bricks and mortar, and one used for walking. While he was walking across the scaffold, a pile of bricks on the material plank broke open and fell on the bricklayers' plank. Mr. Diaz went back to remove the bricks so that the bricklayers would not trip over them. When he stepped on the material plank, it gave way, and he fell. He briefly

[2]"Al" was never identified, although it was suggested that Mr. Diaz was referring to Mr. Allen. However, Mr. Allen was the foreman, not a laborer.

lost consciousness. After he regained consciousness, he was transported to the hospital. He remained in the hospital over night and was released the next day.

On cross-examination, Mr. Diaz denied complaining to Al that there was a problem with the scaffold. However, he acknowledged that he felt there was something wrong when Al was putting up the extensions and told him he was going to put up only a single brace. Mr. Diaz considered the scaffold safe. Mr. Diaz took all of his instructions from Ed Allen from Larmco. He did not take any instructions from anyone from Boller. He did not hear any warning not to step on the plank. He never complained to Mr. Allen about the scaffold. He did not know whether the lack of the braces caused his accident.

Miguel Diaz (Miguel)[3] testified that he was employed by Larmco as a laborer and was working with Mr. Diaz on March 19, 2002. One of the material planks holding bricks fell. "Maris," one of the bricklayers, told them to be careful. Mr. Diaz grabbed on to the tower portion of the scaffolding and stepped on the plank. The plank fell with Mr. Diaz on top of it.

According to Miguel, the laborers took their instructions for extending the scaffold and as to safety issues from Mr. Allen. Miguel did not notice anything unusual about the scaffold

---

[3]No relation to the plaintiffs.

prior to the accident. He did not pay any attention to the position of the planks. Miguel and Mr. Diaz cranked the scaffold up to about 15 or 20 feet.

Miroslaw Kundzicz testified that he was employed as a laborer by Larmco. On March 19, 2002, just prior to Mr. Diaz's fall, Mr. Kundzicz was standing on one of the walking planks and noticed that one of the material planks was not completely on the angle iron where it normally rested. About an inch of the plank was resting on the angle iron. Mr. Kundzicz told the laborers nearby that the plank was not positioned correctly and warned them to be careful; he thought Miguel was behind him and would have heard the warning. After turning back to his work, he heard the bricks fall to the walking platform. He noticed that the Boller superintendent was always walking around the project.

On cross-examination by Boller, Mr. Kundzicz testified that he took all of his orders from Mr. Allen. He took no orders or directions from Boller. The planks that fell were material planks. Material planks are not intended for walking. He was not sure what Mr. Diaz was walking on when he fell. The only planks that moved prior to the fall were material planks. He told the laborers that there was something wrong with the planks because it was their job to fix it.

Francisco Gutierrez testified that he was employed as a

6

machine operator by Larmco. Prior to that, he had been a laborer and had assisted in assembling Non-Stop scaffolds and adding extensions to them. On March 19, 2002, he was operating a crane, lifting up bricks to the scaffolding. After he saw Mr. Diaz fall, he stopped the crane and went over to where Mr. Diaz was on the ground. He observed a plank on the ground. When he looked up at the scaffold, two planks were missing. Based on his experience, a straight brace would be placed at the top of the scaffold.

On cross-examination by Boller, Mr. Gutierrez testified that Mr. Allen directed how the scaffold was to be built. Mr. Gutierrez had not been trained to assemble that type of scaffold, but he had assembled them. He had also done pipe scaffolding but that was different from a Non-Stop scaffold. Mr. Allen would be the appropriate person to decide where and when straight braces should be put on the scaffold. Mr. Allen was his foreman; all the directions and orders came from him. Mr. Gutierrez had no dealings with Boller. Larmco employees were the only ones to erect and maintain the scaffold. He did not know what caused the planks to fall or why Mr. Diaz fell. After Mr. Diaz fell, Mr. Gutierrez looked up and saw the straight brace was missing. On redirect examination, Mr. Gutierrez testified that, at the height of the scaffold in this case, when no cross braces are used, a

7

straight brace is placed at the bottom and the top of the scaffold.

Edward Allen, field superintendent for Larmco, testified as an adverse witness. As a field superintendent, he was in charge of projects for Larmco. He had taken an OSHA[4] course in scaffolding. At the time of Mr. Diaz's accident, he was a foreman but was still in charge of supervising the Larmco workers on the project. OSHA required scaffolds to be built under the direction and supervision of a competent person. According to Mr. Allen, he was considered a competent scaffold person. There were scaffold builders but, as the foreman, he was responsible for making sure that the scaffolds were erected correctly.

The day following Mr. Diaz's fall, Mr. Allen inspected the site of the accident in compliance with Larmco's safety manual. In his report of the accident, he noted that two material planks had fallen off the scaffold, one of which fell when Mr. Diaz stepped on it. Mr. Allen acknowledged that there was no straight arm brace at the top of the scaffold but explained that the Non-Stop scaffold used here did not require it. He acknowledged that, at his deposition, he stated that the straight arm brace was to be placed between the two cross braces. During his inspection of the scaffold, he observed that five other straight

---

[4]Occupational Safety and Health Act (29 U.S.C. §651 (2000)).

braces were missing. While Mr. Allen stated that the height of the scaffold in this case did not require a straight brace at every interval where there was no cross brace, he acknowledged that, at his deposition, he had stated that the straight braces were required.

Mr. Allen explained that, as part of his duties, he walked the jobsite every morning and checked the scaffolds to make sure they were safe. They had to be checked every day due to changing conditions, such as the weather. He had checked the scaffolding the morning of Mr. Diaz's accident. Had he noticed the missing braces then, he would have ordered that they be installed. However, he explained that scaffold changes also took place during the day. Mr. Allen was familiar with the tagging system; a scaffold would be tagged to indicate it was okay to use or had problems. Boller did not require Larmco to use the tagging system. It was his understanding that the straight arm braces were taken off when the extensions were added to the scaffold prior to the accident but were not put back on the scaffold.

Mr. Allen identified Ben Chambers as Boller's job superintendent for the project. While Larmco was responsible for the scaffolding, if Mr. Chambers noticed a problem, he would inform Mr. Allen, and the problem would have to be fixed. Mr. Chambers was in charge of where and when Larmco did its work.

9

Mr. Chambers had the right to stop work for safety reasons. Mr. Chambers had the right to instruct Larmco personnel to implement safety procedures for scaffolding, but only if he knew what they were.

On cross-examination by Boller's attorney, Mr. Allen explained that at the time of his deposition, he had confused the Non-Stop scaffold with the Morgan scaffold and had testified about the Morgan scaffold rather than the Non-Stop scaffold that Larmco used in the project. The Non-Stop scaffold required bracing at a higher level, 36 feet, than did the Morgan scaffold. The scaffold in this case was not required to go to 36 feet.

As part of his job, Mr. Allen oversaw the safety aspect of Larmco's work. Larmco had safety training for its workers and laborers, including weekly safety meetings. The bracing of the scaffold was Larmco's job. There had been no complaints about the scaffolding. Boller would not have any reason to believe that there was a problem with Larmco's scaffold.

On redirect examination, Mr. Allen acknowledged, based on his investigation, it was possible Mr. Diaz's fall was due to the missing straight brace, which caused the scaffold to separate. On re-cross-examination by Boller, Mr. Allen stated that the measurements he took during his investigation indicated that the scaffold was in the same position it was in prior to the

10

accident.

Benjamin Chambers testified as an adverse witness. Mr. Chambers worked for Boller as a construction superintendent and, as such, was the Boller person responsible for preventing accidents on the project. Mr. Chambers would arrive on the project site at 6:30 a.m. and would spend 30 minutes inspecting the site. He would look at the scaffolding every morning to make sure there were no safety deficiencies. He also walked around the site at other times during the day looking for safety problems. As the Boller construction superintendent, Mr. Chambers had the authority to stop the work if a subcontractor was using unsafe equipment or doing work in an unsafe manner. On two occasions, he had stopped excavation work on the site. While he had experience in excavation work, he had no experience in scaffolding. He did not know when straight braces were required or the number of bricks that could be placed safely on the material planks.

All of the subcontractors were required to give Mr. Chambers a copy of their safety manuals. According to Larmco's safety manual, there was a checklist for tower scaffolding. However, Mr. Chambers never collected the checklists to determine if Larmco was using and following them in its work on the project. He was not familiar with the tagging system. He did not know

11

what the qualifications were for someone like Mr. Allen to oversee the construction of the scaffold.

On March 19, 2002, Mr. Chambers did not see anything wrong with the scaffold at 6:30 am. Shortly after lunch on that day, he looked at the scaffold again but did not observe any problem with it.

On cross-examination by Boller, Mr. Chambers described his safety responsibilities on the project: establishing entrances and exits, signage for the construction area, providing fire extinguishers, telephone access and emergency plans. Boller had a safety program dealing with safety hazards that could arise on the project site. Boller was the general contractor on the science building wing. While there were 17 other prime contractors, eventually, Boller began to coordinate those contractors as well.

Mr. Chambers acknowledged that he had no training in scaffolding, but for many years, he had watched them be constructed and knew "what is supposed to happen." He relied on Mr. Allen to use the scaffold correctly. There were no complaints about the scaffold, and Mr. Chambers observed nothing to indicate that Larmco was not competent in its use of its own scaffold. He saw nothing on the morning of the accident to indicate that the scaffold was unsafe. Mr. Chambers relied on

12

Mr. Allen to make that decision whether a brace was required.

William Hickey testified that he had been a part owner of Larmco and had been employed as a general superintendent. He had been a bricklayer and had worked on a variety of scaffolds. He had taken 10-hour and 40-hour OSHA courses. At the time of Mr. Diaz's accident, Mr. Hickey was Larmco's general superintendent. He would spend at least one day a week on the project site. He attended the job meetings and discussed scheduling, safety issues and problems with Mr. Allen. He was not informed of any safety issues with the Non-Stop scaffolding. Weekly safety meetings were held to discuss safety issues. Larmco had its own safety manual, which covered scaffolding.

Mr. Hickey testified further that he inspected the scaffold the day after the accident and found nothing wrong with it. The scaffold appeared to be braced properly. There were no straight braces missing from the top of the scaffold. Straight bracing was used on a Non-Stop scaffold once it reached 36 feet in height.

Mr. Hickey further testified that the general contractor did not tell Larmco laborers how to build the scaffolding. He would not expect the general contractor to tell Larmco's foreman or laborers to put in a straight brace at 36 feet. The contract between Larmco and Boller required Larmco to furnish a competent

13

person as its representative on the site. In this case, that person was Mr. Allen. The laborers received on-the-job training with regard to the scaffold building and maintenance. Mr. Diaz would have received such training.

On cross-examination by the plaintiffs, Mr. Hickey acknowledged that he did not see the scaffolding prior to the accident. He denied that when a scaffold is constructed, a straight brace was placed at the top. He further denied that a straight brace was required on the scaffold for stability purposes. He did not recall his deposition testimony in which he stated that there should be a straight brace at the top of the scaffold for stability and because "[i]t's the way the scaffold's built."

On redirect examination, Mr. Hickey testified that the straight braces were not necessary because each tower worked individually. He believed that the scaffold had been adequately braced.

Frank L. Burg, the plaintiff's expert, testified that he was a certified safety professional. He had worked for OSHA as a compliance officer and then as a training director. He became head of the voluntary protection program, which required him to look at companies and determine the adequacy of their safety programs. Mr. Burg participated in writing the standards at the

14

Nos. 1-08-3622 & 3635 Cons.

American National Standards Institute (ANSI), especially for cranes, scaffolding and safety programs.

Mr. Burg testified that he was familiar with the Non-Stop scaffold used in this case. He stated that a straight brace was required at the bottom and at the top between the scaffolding towers to keep the towers from separating. If the scaffolding was properly constructed, the material planks would not fall out.

Mr. Burg opined that Boller had control and responsibility for the proper construction of the scaffolding based on its control of the safety of the project site. Based on his experience, as part of its control of the project site, Boller would be expected to make sure that its subcontractors were competent, qualified and properly trained. Mr. Burg opined that Boller did not meet its responsibilities regarding scaffold safety, explaining as follows:

"They didn't make sure that the people that were doing the scaffolding were properly trained, that they were competent, that they were qualified, that they had a system of accountability for the scaffolding."

Mr. Burg further opined that Mr. Allen was not a competent or qualified person under OSHA standards because he allowed an untrained worker to erect the scaffold and acknowledged in his deposition that he was unsure who had training and who did not.

15

The tagging system was not used, an important factor given workers' lack of fluency in English. Boller's duty was to make sure the masonry company it hired used trained personnel who followed procedures and that there was a system of accountability, i.e., records of the inspections. In this case, Boller's written safety program consisted of one page. It contained no specific safety rules for the erection of a Non-Stop scaffold. In Mr. Burg's opinion, Boller's safety manual was not adequate to ensure safety at the project site.

Mr. Burg testified further that, as project superintendent, Ben Chambers had responsibility for safety, both under the terms of the contract between Boller and the school district and his job description. Mr. Burg noted that, in his deposition, Mr. Chambers acknowledged that he did not know anything about Non-Stop scaffolds. Mr. Burg explained that, while the general contractor does not have to have complete knowledge of its subcontractors' work, Boller needed sufficient knowledge to assess whether its subcontractor is qualified and competent. When the scaffold was altered by adding the extension, OSHA standards required that it be supervised by a competent person and then reinspected to ensure its safety. In this case, no such inspection was performed.

On cross-examination by Boller, Mr. Burg acknowledged, that

16

with respect to the bracing, Boller or Larmco personnel would have thought that the scaffold conformed to the requirements of the Non-Stop manual. While he understood that the wall the bricklayers were working on would not reach 36 feet and the manual did not call for bracing below 36 feet, Mr. Burg explained that the ground conditions could change or the scaffold might be affected by the weather, causing it to be unbalanced. He did not know if the scaffold was in fact unbalanced. He did acknowledge that the planks might have been cracked or might have been knocked out of place by the bricks.

Mr. Burg testified further that OSHA standards provide the minimum requirements. Following OSHA or ANSI standards would not ensure safety. According to Mr. Burg, Mr. Allen was not competent, even though he was trained in scaffold use. Mr. Burg opined that Boller did not do what was reasonable and normal for a general contractor to do as far as implementing a safety program; had they done so, Mr. Diaz's accident would not have occurred. While the scaffold looked in perfect condition when Mr. Chambers viewed it, it should have been reinspected after the addition of the extension. Had the planks been checked, the accident would not have happened. Mr. Burg agreed that the Non-Stop manual stated that braces were not needed until the scaffold reached 36 feet.

17

Nos. 1-08-3622 & 3635 Cons.

On redirect examination, Mr. Burg testified that a 2006 Non-Stop publication showed scaffolds at the same height as or shorter than the one from which Mr. Diaz fell; there were straight braces at the top of the scaffolds. In his deposition testimony, Mr. Allen agreed with Mr. Burg that straight braces should have been provided on the scaffold in this case. Mr. Burg opined that the Larmco safety manual was not implemented on this project. Boller was required to make sure that its subcontractors had a safety program and that they were competent and qualified. Had the straight brace been at the top, the plank would not have fallen out.

Wendell Rust, Boller's expert, testified that he was employed as a safety professional. Previously, he worked for OSHA as an inspector and a consultant. While working for OSHA, he inspected many construction projects, including scaffolding. He was an authorized OSHA trainer and had taken training for scaffold construction and use.

Mr. Rust testified that, under OSHA rules, Boller was the "controlling" employer and was not normally required to inspect for hazards or have the same level of knowledge of the applicable standards for the trades. It was Larmco's responsibility to train its workers who utilized the scaffolds. Mr. Rust opined that Boller did nothing to cause the accident in this case. He

18

found no evidence that would have indicated to Boller that Mr. Allen was not competent to oversee the scaffold.

According to Mr. Rust, Boller met its responsibilities on the construction site by providing training for their management personnel, by using a safety consultant to do additional safety management and by having a safety director/superintendent (Mr. Chambers) who had the authority to stop the work if he saw something wrong. Mr. Chambers had taken a 30-hour training course and checked the jobsite for unsafe conditions. Had there been anything obviously wrong with the scaffolding, Mr. Chambers could order the work stopped and require the subcontractor and his employees to fix it.

Mr. Rust testified that, based on OSHA regulations, the Non-Stop assembly instructions and the Larmco safety manual, there was no need to place a straight brace at the top of the scaffold. If one of the towers was not secure because of swaying, there would have been an obvious problem with the scaffold.

On cross-examination by the plaintiffs, Mr. Rust acknowledged that the contract between Boller and the school district required Boller to be responsible for safety in performance of the contract and required it to provide a competent superintendent. He agreed that the superintendent should be able to identify hazards or unsafe conditions in the

19

scaffolding.  He was familiar with Mr. Chambers's statements in his deposition that he had no specific training in scaffolding and that he was not certified by OSHA to build scaffolding.

### B. Damages Testimony

Dr. Ernest John Saliba, Jr., an emergency room physician at Evanston Hospital, examined Mr. Diaz following his fall from the scaffold.  The plaintiff had fallen from a height of 20 to 30 feet; 50% of the people experiencing such a fall do not survive. Mr. Diaz exhibited swelling in his right forearm and a scalp laceration.  He had abrasions on his lower back and complained of pain in that area.  A CT scan of his head revealed no injury.  On cross-examination, Dr. Saliba testified that the CT scan of Mr. Diaz's neck was negative but did show degenerative changes.  The CT scan of his abdomen showed that there were no fractures or dislocations to his spine.

Mr. Diaz testified that, for the first few days following his fall, he remained in bed; he felt very bruised and could not move.  He saw either Dr. Marcus or Dr. Vanderbilt and complained of pain throughout his body.  He was given pills and prescribed physical therapy.  Dr. Marcus performed surgery on his right knee after which he returned for more physical therapy.  In November 2002, Mr. Diaz was examined by Dr. Shenker.  Mr. Diaz complained of pain in his neck, back and his eyes.

Nos. 1-08-3622 & 3635 Cons.

Mr. Diaz was next examined by Dr. Skaletsky. Mr. Diaz complained of constant headaches, dizziness and neck and shoulder pain. He also complained of pain in his lower back radiating into his leg.[5] Recently, Dr. Skaletsky referred him to Dr. Jain at PainNet. Dr. Jain treated him with injections. He still has pain in his neck and back. He takes medication for the pain and wears a back brace. He also has pain in his jaw; when he opens his mouth a lot, it cracks.

Mr. Diaz explained that he felt very stressed from not being able to move or to work. He has been unsuccessful at obtaining work in other industries and was not working at the time of trial.

Ronald Agrigento, a physical therapist, testified that he examined Mr. Diaz on April 9, 2002. The examination revealed that Mr. Diaz had a diminished range of motion and strength in his shoulder and his right knee; the knee was swollen, and he had a large bruise on his lower extremity. Mr. Diaz rated his pain as very high. He had three sessions of therapy after which he had surgery on his knee. On June 4, 2002, he returned for more therapy, primarily on his knee. He then began the work-hardening therapy program. Mr. Diaz worked hard at his therapy. An evaluation showed that he did not meet the requirements for heavy

[5]Mr. Diaz did not specify which leg.

21

work but was able to perform medium work.

Mr. Agrigento testified further that, in March 2005, Mr. Diaz returned for an evaluation and treatment of his lower back pain. Testing revealed that he had diminished range of motion in his lumbosacral spine and a diminished curve indicating some form of tightness or spasm in the spine. By the end of April 2005, he showed improvement; his pain levels were reduced and his range of motion nearly doubled. Mr. Diaz was still having problems and complained of experiencing a slight headache every morning.

On cross-examination by Boller, Mr. Agrigento testified that, in May 2002, Mr. Diaz had undergone surgery to repair a meniscus tear in his right knee. At the time of the first evaluation in June 2002, there was no mention of lower back pain. At the time of the second evaluation in July 2002, Mr. Diaz complained of headaches and that his right knee gave out occasionally. He also experienced a sensation of "pins and needles" in his right knee except when walking. There was no complaint of lower back pain at that time.

Dr. Gary S. Skaletsky, a board-certified neurosurgeon, testified that he first examined Mr. Diaz on March 25, 2003. Mr. Diaz complained of pain in his head and neck, and pain, as well as numbness and weakness, in his right arm. His examination revealed a muscle spasm in the right trapezius muscle. Given Mr.

22

Diaz's history and his examination, Dr. Skaletsky concluded that Mr. Diaz's complaints were related to his fall. The doctor ordered X-rays of Mr. Diaz's neck and an MRI of his spine. The X-ray showed degenerative changes but no instability. The MRI showed the degenerative changes expected in a man of Mr. Diaz's age but not a slipped disc. The doctor explained that degenerative changes do not typically result in pain, but a traumatic event can cause the changes to produce pain.

When Mr. Diaz returned to see Dr. Skaletsky in May 2003, his symptoms had not changed. Dr. Skaletsky opined that Mr. Diaz's fall irritated the nerve root and resulted in loss of sensation and pain in his right arm. The doctor further opined that Mr. Diaz should not return to his work as a laborer; his pain and limited motion and the difficulty in using his right arm put him and people working with him at risk. Dr. Skaletsky recommended physical therapy. However, Mr. Diaz could not afford physical therapy at that time.

On September 15, 2003, Dr. Skaletsky examined Mr. Diaz who, for the first time, complained of low back pain radiating into his right leg all the way to his ankle; the pain was worse with activity. Mr. Diaz had a limited range of motion, and straight leg tests indicated he had an irritation of the sciatic nerve, the nerve stemming from the L5-S1 level. The doctor recommended

23

epidural steroid injections and that Mr. Diaz undergo a course of physical therapy to build and strengthen his muscles.  In the spring of 2005, Dr. Skaletsky referred Mr. Diaz for physical therapy, but he continued to complain of pain in his lower back.

Dr. Skaletsky referred Mr. Diaz to Dr. Jain at PainNet.  On March 20, 2008, Dr. Jain performed a nucleoplasty to reduce the irritation on the disc.  It was necessary to wait 6 to 12 weeks to determine the success of the procedure.  If the nucleoplasty were unsuccessful, the next step would be for Mr. Diaz to undergo an MRI to determine the general state of the nerves.  If the MRI showed nerve root compression, decompression surgery at the L5-S1 level would be an option.  Dr. Skaletsky estimated the attendant costs to be $100,000 for the surgery and $75,000 for hospitalization.  Postoperative physical therapy would take about 6 months, at three times a week for $1,000 per week.

Prior to trial in this case, on April 4, 2008, Dr. Skaletsky examined Mr. Diaz, who still complained of pain in his lower back.  He also complained of neck pain, greater on the left side; the pain extended into his right shoulder and forearm.  The pain was worse with repetitive movements and prolonged positioning. He also had pain in the back of his head radiating from his neck. The doctor noted that these were the same symptoms Mr. Diaz had complained of in 2003.  The doctor further noted that Mr. Diaz

had a limited range of motion in turning his neck to the left; he had tenderness at the back of the neck and the trapezius muscle. He had diminished strength and sensation in his upper right arm.

Dr. Skaletsky reviewed the multiple MRIs of Mr. Diaz's low back. Using the 2006 MRI, the doctor explained that Mr. Diaz had a condition known as spondylolisthesis at the L5-S1 level. Such a condition made him more susceptible to a nerve injury due to trauma.

Dr. Skaletsky opined that Mr. Diaz's lower back pain was related to his fall from the scaffold. Prior to the fall, he had no symptoms of lower back pain or dysfunction. Following the fall, he experienced a rapid onset of symptoms, initially noted in his knee but also in his lower back. Dr. Skaletsky opined that Mr. Diaz's fall aggravated his preexisting condition of spondylolisthesis.

Dr. Skaletsky then testified that, in late 2007 or the beginning of 2008, he received information that Mr. Diaz was having difficulties with his memory and attention span and that he was very irritable. At his April 4, 2008, visit, Mr. Diaz acknowledged those symptoms to the doctor. Because Mr. Diaz reported a loss of consciousness at the time of the accident, the doctor ordered a CT scan, but the results were normal. Dr. Skaletsky explained that some damaged connections were too small

to be seen on a CT scan.  The fact that there was a delay in reporting the symptoms could be attributed to Mr. Diaz's failure to recognize the symptoms as a medical problem.  Dr. Skaletsky opined that Mr. Diaz's symptoms of irritability, memory loss and confusion were causally connected to his fall.  He further opined that Mr. Diaz's conditions are permanent.

On cross-examination by Boller, Dr. Skaletsky acknowledged that Mr. Diaz did not complain of lower back pain until September 2005, and that prior to September 2005, none of the other doctors had treated Mr. Diaz for back pain.  He further acknowledged that at the time of his deposition in January 2005, he testified that, in his opinion, Mr. Diaz's back pain was not related to his fall.  However, at his deposition, he had qualified that opinion by stating that it was based on the information he had at the time.  At his deposition in January 2007, he was shown the Evanston Hospital emergency room records; these records formed the basis of his opinion of causality: Mr. Diaz's fall aggravated existing conditions in his neck and back.

Dr. Skaletsky testified that, except for a complaint at his initial examination in 2003, Mr. Diaz made no complaints relative to his head until his April 4, 2008, examination.  The doctor acknowledged that the emergency room records showed that Mr. Diaz did not lose consciousness.  Dr. Skaletsky acknowledged that it

26

was impossible to say within a reasonable degree of medical certainty whether or not Mr. Diaz would require surgery in the future.

Dr. Daniel Fortuna, a chiropractic physician, testified that he examined Mr. Diaz on January 3, 2004. Mr. Diaz complained of experiencing headaches, dizziness and lower back and neck pain since he had fallen off a scaffold in 2002. The doctor's examination revealed tenderness in his neck, the trapezius muscle and the right-side muscles from his mid to lower back. Tests showed an irritation of the nerve. Dr. Fortuna opined that these symptoms were related Mr. Diaz's fall because he had no complaints prior to the fall. He ordered an MRI; the results indicated spondylolisthesis. The doctor ordered muscle relaxing treatments, stabilization and strengthening exercises.

Dr. Fortuna further testified that, in March 2004, he reassessed Mr. Diaz's condition. While Mr. Diaz had made progress in muscle strength, he still had tension and pain in the nerves. Since Mr. Diaz was not recovering as the doctor had expected, the doctor referred him to an orthopedic surgeon. In April 2004, Dr. Fortuna examined Mr. Diaz. While he was feeling better, Mr. Diaz complained of headaches, three or four times a week. He had constant lower back pain but of a milder intensity. The pain increased with sitting.

Nos. 1-08-3622 & 3635 Cons.

Dr. Fortuna testified further that he examined Mr. Diaz in October 2006. Mr. Diaz filled out a questionnaire to provide information as to his pain level and the effect it was having on his life. Mr. Diaz indicated that his pain level was very intense and did not vary. The pain affected his sleeping, his ability to sit and even his ability to wash and dress himself. He could lift only very light weights. The pain restricted his social life and his ability to walk and to travel. Mr. Diaz indicated that the pain extended from his low back up to his neck and the back of his head; the sides of his head hurt. He had continuous jaw pain; it was hard to chew and to swallow. He had numbness and a tingling sensation from his right knee down. The right knee felt like it had no strength, and he felt as if he would fall. Mr. Diaz felt angry and depressed and believed that his personality had changed. His mood change began about two years after the accident. He experienced right shoulder pain intermittently. Dr. Fortuna opined that, given his condition, Mr. Diaz could not work.

Testimony from family members and a friend confirmed Mr. Diaz's personality change and memory problems. There was expert testimony from Charles Linke, an economist, establishing that the average life expectancy for Mr. Diaz was 21 years.

ANALYSIS

28

## I. Boller's Appeal

### A. <u>Directed Verdict/Judgment N.O.V.</u>

Boller contends that it was entitled to a directed verdict or a judgment <u>n.o.v.</u> because there was no evidence of its liability pursuant to section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts §414 (1965)). Section 414 recognizes two theories of liability under which an injured worker may seek to hold a general contractor liable: vicarious and direct liability. In its opening brief, Boller argued that the plaintiffs failed to present evidence to establish its vicarious liability for the plaintiff's injury. However, the plaintiffs maintain that their suit was premised on Boller's direct liability. Therefore, we will confine our discussion to whether the evidence established Boller's direct liability under section 414 for Mr. Diaz's accident.

### 1. Directed Verdict

#### a. <u>Standard of Review</u>

The court applies the <u>de novo</u> standard of review to the denial of a motion for a directed verdict. <u>Jones v. DHR Cambridge Homes, Inc.</u>, 381 Ill. App. 3d 18, 28, 885 N.E.2d 330 (2008). "'A directed verdict is appropriate where the plaintiff has failed to establish a <u>prima facie</u> case.'" <u>Jones</u>, 381 Ill. App. 3d at 28, quoting <u>Kim v. Mercedes-Benz, U.S.A., Inc.</u>, 353

29

Nos. 1-08-3622 & 3635 Cons.

Ill. App. 3d 444, 460, 818 N.E.2d 713 (2004). "'A directed verdict is granted improperly where "there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome."'" Jones, 381 Ill. App. 3d at 28, quoting Kim, 381 Ill. App. 3d at 460, quoting Maple v. Gustafson, 151 Ill. 2d 445, 454, 603 N.E.2d 508 (1992).

### b. Discussion

A cause of action for common law negligence under section 414 requires that the plaintiff allege a duty on the part of the defendant, a breach of that duty and a compensable injury resulting from the breach. Bokodi v. Foster Wheeler Robbins, Inc., 312 Ill. App. 3d 1051, 1059, 728 N.E.2d 726 (2000). Boller contends that it did not owe a duty to the plaintiff because it did not retain any contractual control over Larmco's work on the project.

### i. Existence of Duty

"As a general rule, one who entrusts work to an independent contractor will not be liable for the acts or omissions of that independent contractor." Calderon v. Residential Homes of America, Inc., 381 Ill. App. 3d 333, 340, 885 N.E.2d 1138 (2008).

30

Nos. 1-08-3622 & 3635 Cons.

The "retained control exception" to this rule is set forth in section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts §414 (1965)). Section 414 provides as follows:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts §414, at 387 (1965).

Comment a to section 414 explains the distinction between "vicarious" liability and "direct" liability, which is at issue in this case, as follows:

"If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be

31

dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others."

Restatement (Second) of Torts §414, Comment a, at 387 (1965).

As this court noted in Cochran v. George Sollitt Construction Co., 358 Ill. App. 3d 865, 832 N.E.2d 355 (2005), comment a clarifies that "the general contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence; alternatively, even in the absence of such control, the general contractor may be directly liable for not exercising his supervisory control with reasonable care." Cochran, 358 Ill. App. 3d at 874.

Comment b to section 414 explains the theory of direct liability described in comment a of section 414. Comment b provides:

"The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through

32

a foreman superintends the entire job.  In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself.  So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so."  Restatement (Second) of Torts §414, Comment b, at 387-88 (1965).

Comment c to Section 414 explains that for the "retained" control exception to apply:

"[T]he employer must have retained at least some degree of control over the manner in which the work is done.  It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.  Such a general right is usually

33

reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail.  There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."  Restatement (Second) of Torts §414, Comment c, at 388 (1965).

The determination of whether Boller owed a duty of care to the plaintiff depends on whether Boller controlled the work in such a manner that it should be held liable.  Bokodi, 312 Ill. App. 3d at 1059.  The following portions of the contract between Boller, the school district and the architect were entered into evidence at trial:

"The contractor shall take reasonable precautions for the safety of and shall provide reasonable protection to prevent damage, injury or loss to: One, employees who work or other persons who may be affected thereby.

* * *

The contractor shall designate a responsible member of contractor's organization at the site whose duty shall be the prevention of accidents.

* * *

The contractor shall be responsible for initiating, maintaining and supervising all safety precautions and

34

Nos. 1-08-3622 & 3635 Cons.

programs in connection with the performance of the contract.

* * *

The contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the project site during the performance of the work.

* * *

The contractor shall supervise and direct the performance of the work using his best skill and attention. The contractor shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the work under the contract."

An employer need only retain control over any part of the work in order to be subject to liability for a failure to exercise his control with reasonable care. Brooks v. Midwest Grain Products of Illinois, Inc., 311 Ill. App. 3d 871, 726 N.E.2d 153 (2000). "[A] general right to ensure that safety precautions are observed and that work is done in a safe manner will not impose liability on the general contractor unless the evidence shows that the general contractor retained control over the means and methods of the independent contractor's work." Ross v. Dae Julie, Inc., 341 Ill. App. 3d 1065, 1071, 793 N.E.2d 68 (2003). "In determining whether that level of control has

35

been retained, Illinois courts ask whether the principal merely retained general oversight of work progress and safety or actually engaged in detailed supervision and/or control of the subcontractors' methods and means of performing work." Aguirre v. Turner Construction Co., 501 F.3d 825, 830 (7th Cir. 2007). Whether a contractor has retained sufficient control to trigger liability under section 414 is generally a question of fact. Wilkerson v. Paul H. Schwendener, Inc., 379 Ill. App. 3d 491, 884 N.E.2d 208 (2008)

Boller argues that it did not retain any contractual control over Larmco because the language giving it control over construction means, methods and techniques was stricken from the contract. However, controlling the operative details of the subcontractors' work is necessary for vicarious liability; direct liability stems from the failure to exercise general supervisory control. Pestka v. Town of Fort Sheridan Co., 371 Ill. App. 3d 286, 300, 862 N.E.2d 1044 (2007).

In the present case, the plaintiffs presented sufficient evidence to establish a prima facie case that Boller retained sufficient control over the safety of the project to trigger its liability for the plaintiff's injuries. The provisions of the contract between Boller, the school district and the architect placed the responsibility for the safety of the project site with

36

Boller. Under the contract, Boller was responsible for preventing injuries on the project site. It was required to initiate, maintain and supervise all of the safety precautions and programs in the performance of its contract. It also was required to designate a person responsible for the prevention of accidents and to employ a "competent" superintendent. Boller was solely responsible for "all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the work under the contract." Under the contract between Boller and Larmco, Larmco was responsible for the safety and training of its employees. However, that contract also required Larmco to follow all of Boller's safety directions and, in emergency situations, Boller could implement the safety measures and require Larmco to pay for them.

The testimony at trial confirmed the extent of Boller's control of safety of the project site. Mr. Rust, Boller's expert witness, testified that the contract between Boller and the school district required Boller to be responsible for safety in the performance of the contract. In meeting those responsibilities, Mr. Rust pointed out that Boller provided training for its management personnel, provided a safety consultant to do additional safety management and gave its superintendent the authority to stop work if he observed a

37

problem.  Mr. Hickey testified that weekly safety meetings were held to discuss safety issues.  Mr. Chamberlain, Boller's superintendent, testified that it was his job to prevent accidents.  He had the authority to stop the work of a subcontractor if the contractor was using unsafe equipment or doing the work in an unsafe manner.  On two occasions, he had stopped an excavation on the project site.  See Wilkerson, 379 Ill. App. 3d at 497 (the assertion of the general contractor's discretionary authority was the best evidence of the retention of more than a general right of supervision).  The subcontractors were required to give Mr. Chambers a copy of their safety manuals.  He walked the project site to check for safety deficiencies.  Mr. Allen testified that, if Mr. Chambers observed a problem with Lamarco's work, Mr. Chambers had the authority to stop the work and order the problem fixed.  According to Mr. Allen, provided he knew what safety measures were required, Mr. Chambers had the right to instruct Larmco personnel to implement those safety procedures for the scaffolding,

Boller also argues that the responsibility for the prevention of accidents was passed on to Larmco under the terms of its contract with Larmco.  Under the Boller/Larmco contract, Larmco assumed the same duties toward Boller which Boller assumed toward the school district.  However, given the evidence in this

38

case, whether Boller actually passed on the ultimate responsibility for the safety of the project site to Larmco was a question for the jury to resolve.

## ii. Notice

The general contractor's knowledge, actual or constructive, of unsafe work methods or a dangerous condition is a precondition to direct liability. <u>Cochran</u>, 358 Ill. App. 3d at 879-80. In <u>Cochran</u>, the court upheld summary judgment for the general contractor where the evidence showed that the unsafe ladder setup was in existence for only an hour prior to the plaintiff's injury. The court noted that none of the contractor's "'competent persons'" had observed the unsafe setup during that short period of time. <u>Cochran</u>, 358 Ill. App. 3d at 880.

Boller maintains that, because Mr. Chambers acknowledged he was unfamiliar with the Non-Stop scaffold and would not have known that the failure to place a straight brace at the top was a potential safety hazard, it cannot be held to have had actual or constructive knowledge of any safety hazard. We disagree.

Under the contract, Boller was required to furnish a "competent superintendent." According to the plaintiff's expert, Mr. Burg, Mr. Chambers was not competent because he admitted that he was unfamiliar with the Non-Stop scaffold used by Larmco. Mr. Burg explained that, while the general contractor was not

39

expected to have substantive knowledge about every subcontractor's trade, to be competent, its superintendent needed to be able to ask the right questions to make sure the subcontractor was qualified and competent. Mr. Rust, Boller's expert, agreed that the superintendent should be able to identify hazards or unsafe conditions in the scaffolding.

On the morning of the accident, Mr. Chambers checked the scaffold around 6:30 a.m. and observed nothing wrong with it. Although he was in charge of safety and preventing accidents at the project site, Mr. Chambers lacked the training and experience to recognize a problem with the scaffold. Sometime thereafter, the scaffold was extended without placing the straight brace at the top. Around 1 p.m., Mr. Chambers again looked at the scaffolding, but he failed to observe that the scaffold had been extended and did not check to see if a reinspection of the scaffold had been made after the extension had been added. The plaintiff's accident happened about an hour later. Thus, there was evidence that Boller should have known that the scaffold presented a safety hazard.

We conclude that the plaintiffs presented sufficient evidence to establish a prima facie case as to Boller's notice of a dangerous condition. Therefore, the trial court did not err in denying Boller's motion for a directed verdict.

Nos. 1-08-3622 & 3635 Cons.

## 2. Judgment n.o.v.

### a. Standard of Review

"A trial court should enter a judgment non obstante veredicto (judgment n.o.v.) only if all the evidence, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict could ever stand." Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc., 342 Ill. App. 3d 150, 156, 794 N.E.2d 829 (2003). This court reviews whether the trial court met that standard de novo. Check, 342 Ill. App. 3d at 156.

### b. Discussion

Our supreme court has held that "a judgment n.o.v. may not be granted merely because a verdict is against the manifest weight of the evidence." Maple, 151 Ill. 2d at 453. In ruling on a motion for a judgment n.o.v., the trial court "does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." Maple, 151 Ill. 2d at 453. "[I]f there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the

41

outcome," the trial court has no right to enter a judgment n.o.v.
Maple, 151 Ill. 2d at 454.

In this case, the jury heard conflicting testimony relating to the necessity of straight braces at the top of the scaffold. The expert witnesses for the plaintiffs and Boller presented conflicting testimony as to the control exercised by Boller over the project and as to the competency of Mr. Chambers and Mr. Allen. The verdict as to liability in this case was based on the jury's resolution of these conflicts in the evidence. Therefore, the trial court did not err in denying Boller's motion for a judgment n.o.v.

### 3. Section 343 Liability

Because we have determined that Boller was liable under section 414 of the Restatement (Second) of Torts, we need not address its liability under section 343 of the Restatement (Second) of Torts.

### B. Jury Instructions

Boller contends that it is entitled to a new trial because the IPI construction negligence instructions given to the jury did not set forth an accurate statement of the law. It argues that the trial court erred by rejecting the non-IPI instructions it tendered.

### 1. Standard of Review

Nos. 1-08-3622 & 3635 Cons.

In <u>Barth v. State Farm Fire & Casualty Co.</u>, 228 Ill. 2d 163, 886 N.E.2d 976 (2008), our supreme court held that when the issue is whether jury instructions accurately reflect the applicable law, the court's review is <u>de novo</u>. <u>Barth</u>, 228 Ill. 2d at 170.

2. Discussion

Boller proposed to modify Illinois Pattern Jury Instructions, Civil, No. 55.01 (2006) (hereafter IPI Civil (2006) No. 55.01) as follows:

> "One who entrusts work to an independent contractor but who retained some control over the manner in which the work is done owes a duty to exercise reasonable care with respect to its retained control.
>
> One who retained some control over the manner in which the work is done can be liable for injuries resulting from the work if the injuries were proximately caused by the failure to exercise that control with ordinary care."

The trial court rejected the modified instruction, and the jury was instructed as follows:

> "A contractor who entrusts work to a subcontractor can be liable for injuries resulting from the work if the contractor retained some control over the safety of the work and the injuries were proximately caused by the contractor's failure to exercise that control with ordinary care." IPI

43

Nos. 1-08-3622 & 3635 Cons.

Civil (2006) No. 55.01.

Boller tendered a modified IPI Civil (2006) No. 55.02, which read as follows:

"A party who retained some control over the manner in which the work is done, has a duty to exercise that control with ordinary care.

When I use the words, 'retained control' the party must have retained at least some degree of control over the manner in which the work is done. To be liable, a party must have more than a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work his own way."

The trial court refused Boller's modified IPI Civil (2006) No. 55.02 instruction. The court did modify the first sentence of the IPI instruction. The instruction the jury received read as follows:

"A party who retained some control over the safety and/or the manner in which the work is done has a duty to exercise that control with ordinary care."

44

Nos. 1-08-3622 & 3635 Cons.

The trial court rejected Boller's proposed issues instruction. Over its objection, the jury received IPI Civil (2006) No. 55.03, which in pertinent part stated as follows:

"Plaintiffs Jose and Maria Diaz seek to recover damages from the Defendant Boller Construction Co. In order for Jose and Maria Diaz to recover, they have the burden of proving:

1. Defendant Boller Construction Co., retained some control over the safety of the work ***."

Finally, over Boller's objection, the jury received IPI Civil (2006) No. 55.04, which read as follows:

"One or more persons may have some control over the safety of the work. Which person or persons had some control over the work under the particular facts of this case is for you to decide."

Boller maintains that the IPI construction negligence instructions did not accurately state the law because they failed to qualify the term "some control over the work." This court rejected the same argument in Jones.

In Jones, the contractor tendered modified IPI construction negligence instructions similar to the ones tendered by Boller in this case. The trial court refused to instruct the jury with the modified instructions. On appeal, the contractor argued that the

patterned instructions did not accurately reflect the law based on the decision in <u>Martens v. MCL Construction Corp.</u>, 347 Ill. App. 3d 303, 807 N.E.2d 480 (2004). In <u>Martens</u>, this court rejected the holding in <u>Moss v. Rowe Construction Co.</u>, 344 Ill. App. 3d 772, 801 N.E.2d 612 (2003), that the central issue was the contractor's ability to control the safety of the project. Instead, the court in <u>Martens</u> held that "'[t]he central issue is retained control of the independent contractors's work, whether contractual, supervisory, operational, or some mix thereof. The party who retains control is the logical party upon whom to impose the duty to ensure worker safety.'" <u>Jones</u>, 381 Ill. App. 3d at 37, quoting <u>Martens</u>, 347 Ill. App. 3d at 318.

In <u>Jones</u>, this court pointed out that, despite its holding, the court in <u>Martens</u> referred to IPI Civil (2005) No. 55.02 without criticism. In <u>Martens</u>, there was no evidence that the mere existence of the safety program affected the contractor's means and methods of doing his work. However, in <u>Jones</u>, the general contractor could require compliance with its safety standards and stop the work if the subcontractor's employees were violating its safety rules. <u>Jones</u>, 381 Ill. App. 3d at 38. While maintaining a general right to safety would not be sufficient under <u>Martens</u>, in this case, as in <u>Jones</u>, Boller had the right to stop the work if Larmco was doing work in an unsafe

46

manner.

We conclude that the IPI construction negligence instructions continue to reflect an accurate statement of the law.  Moreover, Boller's proposed instructions were premised on vicarious liability.  The jury found Boller directly liable.  As the jury was properly instructed, Boller is not entitled to a new trial.

### C. Trial Court Errors

Boller contends that trial court errors, either individually or cumulatively, require that it receive a new trial.

### 1. Standard of Review

The trial court's evidentiary rulings are reviewed under the abuse of discretion standard.  Jones, 381 Ill. App. 3d at 34.

### 2. Discussion

### a. Failure to Allow Cross-examination as an Adverse Witness

Boller contends that the trial court erred when it refused to allow it to cross-examine as adverse witnesses, William Hickey, Edward Allen, Miroslaw Kundzicz, Francesco Gutierrez and Miguel Diaz.

With the exception of Mr. Hickey's testimony, Boller failed to provide citations to the record where it was denied the opportunity to cross-examine the above witnesses and failed to provide argument on the issue.  Boller merely states that it was

47

Nos. 1-08-3622 & 3635 Cons.

prejudiced. Supreme Court Rule 341(h)(7) requires citation to the pages of the record where the denial took place, as well as argument in support of the issue. 210 Ill. 2d R. 341(h)(7). Failure to comply with our supreme court rules is grounds for disregarding the argument on appeal. Burmac Metal Finishing Co. v. West Bend Mutual Insurance Co., 356 Ill. App. 3d 471, 825 N.E.2d 1246 (2005).

Boller does argue that it should have been permitted to cross-examine Mr. Hickey as an adverse witness pursuant to section 2-1102 of the Code of Civil Procedure. 735 ILCS 5/2-1102 (West 2008) (allowing officers, directors, managing agents or foreman of any party to the action to be cross-examined). While Mr. Hickey had been an employee and part owner of Larmco, at the time of trial, he had been retired for three years. See Bassett v. Burlington Northern R.R. Co., 131 Ill. App. 3d 807, 476 N.E.2d 31 (1985) (section 2-1101 requires that the witness be in a supervisory position with the opposing party at the time the witness is called to testify).

Fornoff v. Parke Davis & Co., 105 Ill. App. 3d 681, 434 N.E.2d 793 (1982), relied on by Boller, is distinguishable. In that case, the reviewing court held that no showing of adversity was required before a codefendant could examine another codefendant as an adverse witness. The fact that it was to each

48

codefendant's advantage to shift the liability was considered sufficient adversity by the court to allow one codefendant to call and cross-examine another codefendant. Fornoff, 105 Ill. App. 3d at 690. In this case, Mr. Hickey was not a codefendant.

We conclude that the trial court did not abuse its discretion when it denied Boller's request to examine Mr. Hickey as an adverse witness. We further conclude that the issue is waived as to the remaining witnesses specified by Boller.

b. Mention of Workers' Compensation/Insurance

During direct examination, Mr. Diaz was questioned as follows:

"When you were going to the clinic, did Larmco have a nurse who was following - -"

Larmco's attorney objected based on a motion in limine barring reference to Mr. Diaz's workers' compensation case. The objection was sustained. The trial court advised the plaintiffs' attorney to instruct Mr. Diaz not to refer to workers' compensation.

Later during direct examination, Mr. Diaz was questioned about his November 2002, examination by Dr. Shenker. When asked if the doctor prescribed any treatment, the plaintiff testified:

"No. The only thing he said at that time was that he didn't know that he would give a report to the company or the insurance. I don't know. But that's all he told me."

The trial court denied Larmco's attorney's request to be heard but

49

instructed the jury to disregard the last portion of Mr. Diaz's response and ordered the questioning to continue.

During a break in Mr. Diaz's testimony, Larmco moved for a mistrial based on Mr. Diaz's references to insurance and workers' compensation. The trial court found that the reference was unintentional and denied the motion.

Not every mention of insurance in a personal injury trial requires the court to declare a mistrial. Neyzelman v. Treitman, 273 Ill. App. 3d 511, 515, 652 N.E.2d 1300 (1995). "A reference to insurance is only prejudicial if it directly indicates that the defendant is insured [citation] or if it is the product of conduct by counsel intended to influence or prejudice the jury [citation]." Neyzelman, 273 Ill. App. 3d at 515. Neither of those instances is present in this case. Moreover, the trial court instructed the jury to disregard the reference to insurance. In general, the prejudicial impact of a remark may be cured if the trial court sustains the objection and instructs the jury to disregard the objectionable testimony. See Nickon v. City of Princeton, 376 Ill. App. 3d 1095, 877 N.E.2d 776 (2007).

We conclude that Boller was not prejudiced by the reference to workers' compensation and insurance.

c. Closing Argument

50

Nos. 1-08-3622 & 3635 Cons.

Boller contends that the following remark by the plaintiffs' attorney during closing argument required that the trial court declare a mistrial.

During closing argument, the plaintiff's attorney stated as follows:

"I would also like to suggest to you in using your common sense and ordinary experience in the affairs of life that when Mr. Daley [Boller's attorney] cross-examined Mr. Allen and then Mr. Gutierrez, I think your common sense should tell you and probably does tell you that this is a team effort."

The trial court sustained Boller's objection.

At the conclusion of the plaintiffs' closing argument, Boller made a motion for a mistrial; Larmco joined in the motion. While the trial court agreed the remark was improper, it found no prejudice and denied the motion.

In his rebuttal argument, the plaintiffs' attorney stated:

"It's Boller who brought Larmco into this case, not the Diaz'. But you could never tell that from what's happened in this courtroom over the last two weeks because there's a love fest between those two."

The trial court sustained Larmco's objection.

Improper comments at closing do not constitute reversible error unless they result in substantial prejudice to the party.

51

Nos. 1-08-3622 & 3635 Cons.

Tierney v. Community Memorial General Hospital, 268 Ill. App. 3d 1050, 1061, 645 N.E.2d 284 (1994). Counsel is allowed broad latitude in drawing reasonable inferences and conclusions from the evidence. Tierney, 268 Ill. App. 3d at 1061. The trial court's ruling on whether counsel has stayed within the bounds of proper argument will not be reversed absent a clear abuse of discretion. Tierney, 268 Ill. App. 3d at 1061; but see People v. Wheeler, 226 Ill. 2d 92, 871 N.E.2d 728 (2007) (court now applies de novo review to whether remarks in closing argument require a new trial for a criminal defendant).

While discussing Mr. Allen's testimony with the parties' attorneys, the trial court expressed concern that the jury might be confused. The court stated to Boller's and Larmco's attorneys that "it really looks like you're bootstrapping each other's cases and it's two on one in there." Therefore, the plaintiffs' attorney's argument could be construed as reasonable comments on how Boller and Larmco were conducting their respective defenses in this case.

Even if the remarks were error, a new trial will not be granted unless the remarks are clearly improper, prejudicial and denied the party a fair trial when the trial is viewed in its entirety. Tierney, 268 Ill. App. 3d at 1061. While Boller claims it was prejudiced, there is no indication that the jury's verdict against Boller was in any way influenced by the two comments by the

52

plaintiffs' attorney.  The trial court did sustain the objection, and the jury was properly instructed as to the purpose of closing arguments.  We conclude that the denial of Boller's motion for a mistrial was not an abuse of discretion.

Finally, Boller maintains that the cumulative effect of these errors require that it receive a new trial.  Boller's reliance on Christou v. Arlington Park-Washington Park Race Tracks Corp., 104 Ill. App. 3d 257, 432 N.E.2d 920 (1982) is misplaced.  In that case, the reviewing court held that cumulative effect of trial court errors and the introduction of improper evidence of damages amounted to prejudicial error requiring a new trial.  Christou, 104 Ill. App. 3d at 260-61.  In the present case, there was no error with regard to the denial of cross-examination.  As to the other alleged errors, Boller suffered no prejudice from the mention of workers' compensation, insurance or from the plaintiffs' closing argument.  Therefore, whether these errors are considered singly or cumulatively,  Boller was not denied a fair trial.

D. Dismissal of Third Party Complaint

1.  Standard of Review

The court reviews the granting of a section 2-619 motion to dismiss de novo.  Westmeyer v. Flynn, 382 Ill. App. 3d 952, 889 N.E.2d 671 (2008).

2. Discussion

Boller contends that the trial court erred in dismissing its third-party complaint for contribution against Larmco. Boller points out that the dismissal of its complaint against Larmco for contribution renders it responsible for the entire judgment amount of $1,076,270.06. That amount exceeds the $1 million amount of insurance coverage Larmco was required to provide Boller under the terms of their contract. Larmco responds that by agreeing that Larmco would provide insurance for Boller, the parties intended that they would look only to the insurance and not impose liability on each other. Larmco relies on the rule stated in Briseno v. Chicago Union Station Co., 197 Ill. App. 3d 902, 557 N.E.2d 196 (1990), that where the parties agree that insurance will be provided as part of their contract, the contract must be interpreted as providing mutual exculpation to the bargaining parties. Briseno, 197 Ill. App. 3d at 905.

Briseno is distinguishable from the present case. There, the reviewing court ruled that the third-party contribution action was properly dismissed where the parties' liability had been determined and satisfied from the proceeds of the insurance policy. Briseno, 197 Ill. App. 3d at 906. The dispositive issue in cases involving the purchase of insurance in the context of contractor indemnification is the status of the underlying suit: "whether a settlement or judgment within the policy's limits was reached

54

Nos. 1-08-3622 & 3635 Cons.

and fully funded by the insurer." <u>Kehoe v. Commonwealth Edison Co.</u>, 296 Ill. App. 3d 584, 588, 694 N.E.2d 1119 (1998).

In <u>Kirincich v. Jimi Construction Co.</u>, 267 Ill. App. 3d 51, 640 N.E.2d 958 (1994), the reviewing court held that the contractor could pursue its contribution action against the subcontractor for the amount that was not covered by insurance. <u>Kirincich</u>, 267 Ill. App. 3d at 55. The court noted that the cases holding that contribution was barred by the rule of mutual exculpation arose in a factual context where the parties' joint insurance had absorbed the entire liability of the party seeking contribution. "Where the joint insurance policy has not fully protected one of the parties against liability, contribution should be allowed to the extent of the party's actual loss." <u>Kirincich</u>, 267 Ill. App. 3d at 55.

Under the Boller/Larmco contract, Lamarco was required to "indemnify and hold harmless [Boller] from and against all claims, damages, loss, and expenses" in connection with the performance of Larmco's work. Larmco provided $1 million in initial coverage to Boller. Following the granting of the remittitur and other credits, the verdict for the plaintiffs totaled $1,076,770.06. Since the insurance funds did not completely indemnify Boller, the trial court erred in granting the dismissal of the contribution action.

II. Plaintiffs' Appeal and Cross-Appeal

55

Nos. 1-08-3622 & 3635 Cons.

The plaintiffs originally appealed from the denial of their motion to adjudicate Larmco's workers' compensation lien. After Boller filed its appeal, the plaintiffs filed a cross-appeal from the grant of the remittitur. If the trial court erred in granting the remittitur, we need not address the issue of the adjudication of the workers' compensation lien. Therefore, we will address first the cross-appeal issue of the granting of the remittitur.

A. <u>Grant of the Remittitur</u>

The plaintiffs contend that the trial court erred in granting the remittitur. The trial court granted Boller's motion for a remittitur, stating as follows:

"After reviewing the testimony of Dr. Skeletsky, it is the court's position that this testimony was based on speculation, relative to the potential future surgery, and further, that the court erred in allowing sanctity [<u>sic</u>] presented to the jury.

The calculations of $100,000 for future surgery, [illegible] for potential future hospitalization, and $26,000 for potential physical therapy costs were inappropriately allowed to present it to the jury. This total is $201,000."

After allowing other setoffs and credits, the court offered the plaintiffs the choice of a new trial or a reduction in the judgment by $217,604.94. The plaintiffs accepted the remittitur.

56

Nos. 1-08-3622 & 3635 Cons.

### 1. Procedural Bar to the Plaintiffs' Appeal

Supreme Court Rule 366 provides in pertinent part that "[c]onsenting to a remittitur as a condition to the denial of a new trial does not preclude the consenting party from asserting on appeal that the amount of the verdict was proper. No cross-appeal is required." 155 Ill. 2d R. 366(b)(2)(ii). However, "a party who consents to a remittitur is bound thereby and is precluded from appealing the entry of the remittitur unless the opposing party appeals from the judgment." Haid v. Tingle, 219 Ill. App. 3d 406, 415, 579 N.E.2d 913 (1991), citing Anderson v. Greyhound Lines, Inc., 34 Ill. App. 3d 643, 339 N.E.2d 465 (1975).

Boller maintains that the plaintiffs are procedurally barred from raising the remittitur issue because they filed a notice of appeal from the judgment. The plaintiffs' appeal raised only the adjudication of Larmco's workers' compensation lien. It was only after Boller filed its notice of appeal from the judgment that the plaintiffs' filed a cross-appeal raising the issue of the remittitur. Therefore, the plaintiffs are not procedurally barred from raising the issue of granting of the remittitur on appeal.

### 2. Standard of Review

A ruling on a motion for a remittitur is reviewed for an abuse of discretion. See Kindernay v. Hillsboro Area Hospital, 366 Ill. App. 3d 559, 572, 851 N.E.2d 866 (2006).

### 3. Discussion

The trial court granted the remittitur after it ruled that Dr. Skaletsky's testimony as to future medical costs had been improperly admitted into evidence. We first address whether the trial court abused its discretion when it ruled Dr. Skaletsky's testimony was inadmissible. Jones, 381 Ill. App. 3d at 34 (evidentiary rulings are reviewed for an abuse of discretion).

### a. Striking of Dr. Skaletsky's Testimony

The plaintiffs contend that the trial court erred in striking Dr. Skaletsky's testimony as to the costs of Mr. Diaz's future treatment. Boller responds that striking of this testimony was proper because Dr. Skaletsky could not testify within a reasonable degree of certainty that Mr. Diaz would require surgery and physical therapy in the future.

Possible future damages are not recoverable by the plaintiff unless they are reasonably certain to follow. Terracina v. Castelli, 80 Ill. App. 3d 475, 480, 400 N.E.2d 27 (1979). Evidence as to damages which is speculative, remote or based upon mere probability is improper. Terracina, 80 Ill. App. 3d at 480. "'Expert testimony is admissible or required as evidence of the certainty of the need and as to the reasonable value of the services to be rendered.'" Biehler v. White Metal Rolling & Stamping Corp., 30 Ill. App. 3d 435, 445, 333 N.E.2d 716 (1975),

58

quoting 22 Am. Jur. 2d <u>Damages</u> §312 (1965).

In <u>Terracina</u>, the reviewing court upheld the striking of a doctor's testimony that further surgery for the plaintiff was possible. Noting that future consequences must be reasonably certain to follow, the court stated as follows:

"Here, the question did not call for an opinion based upon a reasonable degree of medical certainty nor did the answer indicate that future surgery was reasonably certain to follow. Rather, in response to the question, '[I]n your opinion based on the hypothetical question previously asked of you, do you believe that Mr. Terracina is a candidate for future surgery?' Dr. Moody replied, 'It's possible.' Accordingly, we believe that the court properly struck this testimony as being speculative." <u>Terracina</u>, 80 Ill. App. 3d at 480.

The plaintiffs rely on <u>Jeffers v. Weinger</u>, 132 Ill. App. 3d 877, 477 N.E.2d 1270 (1985). In <u>Jeffers</u>, the doctor testified that it was possible the plaintiff might lose her foot as a result of the defendant's malpractice. On cross-examination, the doctor testified that the possibility that the plaintiff might lose her foot was less than 1%. The reviewing court found that the doctor's testimony should be considered by the jury because, regardless of the percentage number, the possibility remained that the plaintiff would suffer the loss of her foot.

Nos. 1-08-3622 & 3635 Cons.

<u>Jeffers</u>, 132 Ill. App. 3d at 884.

In the present case, Dr. Skaletsky was not testifying as to a possible consequence flowing from the negligence in this case based on his expertise. Instead, he was asked to predict what treatment course Mr. Diaz would follow, which was dependant on future test results and Mr. Diaz's own decisions as to the treatment. Dr. Skaletsky's testimony did not rise to the "strong possibility" for the need of future treatment testified to by the doctor in <u>Zitzmann v. Miller</u>, 194 Ill. App. 3d 477, 484, 551 N.E.2d 707 (1990).

The plaintiff also relies on <u>Kamp v. Preis</u>, 332 Ill. App. 3d 1115, 774 N.E.2d 865 (2002). In that case, the court held that as long as the increased risk of future injury is proven within a reasonable degree of medical certainty, evidence of future damages is not speculative. <u>Kamp</u>, 332 Ill. App. 3d at 1121. While Dr. Skaletsky did testify that Mr. Diaz was subject to the risk of future injury, his testimony as to the costs of future surgery and physical therapy was not related to the risk of future injury.

We conclude that Dr. Skaletsky's testimony as to the costs for surgery, hospitalization and physical therapy Mr. Diaz might undergo in future was properly stricken as speculative.

     b. <u>Evidence of Mr. Diaz's Need for Future Medical Care</u>

Even without Dr. Skaletsky's testimony, the plaintiffs

60

maintain that other evidence supported the jury's award of future medical expenses. Our supreme court has observed that "[w]hen reviewing an award of compensatory damages for a nonfatal injury, a court may consider, among other things, the permanency of the plaintiff's condition, the possibility of future deterioration, the extent of the plaintiff's medical expenses, and the restrictions imposed on the plaintiff by the injuries." Richardson v. Chapman, 175 Ill. 2d 98, 113-14, 676 N.E.2d 621 (1997).

Even without the evidence as to the costs of future treatments, the medical evidence established that Mr. Diaz's condition was permanent and that he was at risk for further injury. While the evidence showed that none of the treatments he had undergone so far had been successful, the evidence did not indicate that there was nothing further the doctors could do for him. Apart from the stricken portion regarding costs, Dr. Skaletsky's testimony indicated that there was an ongoing treatment plan for Mr. Diaz.

As our supreme court observed in Richardson, "[t]he determination of damages is a question reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court." Richardson, 175 Ill. 2d at 113. "A verdict will not be set aside

61

Nos. 1-08-3622 & 3635 Cons.

by a court unless it is so excessive that it indicates that the jury was moved by passion or prejudice or unless it exceeds the necessarily flexible limits of fair and reasonable compensation or is so large that it shocks the judicial conscience." Kindernay, 366 Ill. App. 3d at 572. A remittitur should not be granted if the jury's award falls within the flexible range of conclusions reasonably supported by the evidence. Kindernay, 366 Ill. App. 3d at 572.

We conclude that the trial court abused its discretion in granting a remittitur in the amount of costs for future treatment testified to by Dr. Skaletsky. The evidence established that Mr. Diaz's condition was permanent and that he remained at risk for future injury. The evidence further established that he continued to experience pain and loss of strength and that there were further treatments available to give him some relief. It was, therefore, reasonable inference from the evidence that Mr. Diaz will continue to incur medical and medically-related expenses for pain relief and to help him cope with the restrictions imposed on him as a result of his injuries. Given that his past medical bills were $132,000 for the 6 years between his accident and the trial in this case and that his life expectancy was 21 years, an award of $201,000 for future medical expenses was supported by the evidence.

62

### B. Adjudication of Workers' Compensation Lien

In their appeal, the plaintiffs contend that the trial court erred when it denied their motion to reduce Larmco's workers' compensation lien rights to zero based on granting of the remittitur. As we have determined that the granting of the remittitur was error, we need not address this issue.

### III. Conclusion

The jury's verdict as to liability is affirmed. The dismissal of Boller's third-party complaint is reversed, and the cause is remanded for further proceedings. On remand, the trial court is directed to vacate $201,000 of the remittitur and enter judgment in favor of the plaintiffs in the amount awarded by the jury, minus the reductions not contested in this appeal.

Affirmed in part and reversed in part; cause remanded with directions.

GARCIA and LAMPKIN, JJ., concur.